(No. 76630.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CARL WILLIAMS, Appellee.

*Opinion filed March 23, 1995.*

52

Roland Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen and Arleen C. Anderson, Assistant Attorneys General, of Chicago, and Renee G. Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

Rita A. Fry, Public Defender, of Chicago (Murray M. Coffey, Assistant Public Defender, of counsel), for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, Carl Williams was convicted of attempt to commit murder under sections 8—4 and 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4, 9—1) and sentenced to an extended term of 60 years' imprisonment. The appellate court subsequently reversed and remanded for a new trial. (252 Ill. App. 3d 704.) For the reasons that follow, we reverse the appellate court's judgment and affirm the judgment of the circuit court.

We begin our review with the familiar proposition that once a defendant has been found guilty of the crime charged, as Williams was here, the evidence cannot be reweighed. Resolution of conflicts in the evidence is a

matter within the exclusive province of the finder of fact. It is not the function of this court to retry the defendant. Accordingly, upon judicial review, all of the evidence is to be considered in the light most favorable to the prosecution. *People v. Collins* (1985), 106 Ill. 2d 237, 261-62.

The evidence in this case showed that Williams lived with his girlfriend, Marie Henry, and her two children, Denise and Ernie. Ernie, who was two, was the son of Erskine Wilson, a man whom Williams hated. Shortly after moving in with the Henrys, Williams began abusing Ernie. He would beat the toddler's seminude body with a leather belt, punch him in the chest so hard that he could not breathe, force him to stand in a corner for five hours or so at a time, deprive him of food, and humiliate him verbally.

On the evening of July 23, 1987, Williams' abuse took an especially heinous turn. During dinner, Williams struck Ernie in the face with a television remote control device, grabbed the toddler's face so hard that it left marks, then slammed the back of his head on the uncarpeted hardwood floor four times. The force of the blows was substantial, for although Williams was not a large man, the evidence showed that he possessed strength enough to lift a grown man completely off the ground and set him down in a chair. Ernie, by contrast, was only about three feet tall and weighed under 30 pounds.

As Ernie cried out, Williams called him names and repeatedly slapped his face back and forth. The situation then quieted temporarily when Ernie and his sister were sent to bed and Williams set about drinking a pint of gin. This was in addition to 40 ounces of beer he had consumed earlier. At about 11:30 p.m., Williams roused Ernie on the pretext of chastising him for the way he was lying in bed. For some bizarre reason, Williams

insisted that the toddler sleep with his arms to his side, and apparently Ernie had deviated from the required position.

Williams left the room, then returned around midnight and began punching Ernie in the chest. He struck the child four or five times with such force that his mother, Marie, could hear the blows from the next room. As usual, Marie stood by and made no attempt to intercede. When Ernie subsequently attempted to use the bathroom, Williams went in after him, picked him up by the shirt collar, threw him to the ground, and again pounded his head against the floor. Marie counted four blows, the last of which struck Ernie on the side of the face.

Ernie could do nothing but cry. Williams responded by telling the two-year-old that he was a "pussy" and a "punk" just like his father. The boy was then sent to bed, but Williams followed him and administered more abuse. From another room, Marie just listened as her battered child pleaded with Williams to leave him alone. "Stop it" was the last thing she heard Ernie say. It was the last coherent thing he was able to say.

When Marie awoke the following morning, she found her child in a daze. He was conscious, but could not comprehend what she said to him. Rather than seeking medical care, as one would expect, Marie responded by taking a shower, again leaving the boy alone with Williams.

The inevitable happened. During the shower, Marie heard the now familiar sound of Williams' pounding her son's head against the hardwood floor. So loud was the thumping that a neighbor in the apartment below heard it as well. When Marie finally emerged from the bathroom, she found Williams carrying the child. The boy's body was shaking, and his eyes had rolled up into his head.

An ambulance was eventually summoned, and Ernie was taken to the emergency room of St. Francis Hospital in Evanston. The boy was comatose on arrival. He exhibited fresh bruises on his body and face. A CAT scan revealed the presence of a large, right subdural hematoma. The emergency room doctor determined that immediate neurosurgical intervention was necessary. Because the neurosurgeons from St. Francis were not available at the time, the medical staff stabilized the child and made arrangements to have him transferred to Children's Memorial Hospital for further care.

Dr. David McLone, the head of pediatric neurosurgery at Children's Memorial, examined Ernie upon his arrival. He found the boy's pupils fixed and dilated, indicating that his brain was herniating. That means that pressure was forcing Ernie's brain through the opening in the base of the skull and down into his spinal column. There was active bleeding within the skull, and clots had formed. The older clots were estimated to have formed 24 hours or more prior to the examination, while the new bleeding had started within the previous eight hours.

Dr. McLone performed surgery on Ernie almost immediately. He removed the child's skull plate and opened the coverings of the brain to gain access to the intercranial area. When he did so, he was "confronted with blood clots and active bleeding squirting out through the opening in the coverings of the brain." McLone testified that in his 15 years as a neurosurgeon, he had never seen so large a blood clot in a child.

McLone attempted to halt the flow of blood using electrocautery and a coagulating pack, but Ernie's brain began to swell uncontrollably, so McLone had to end the operation. The whole procedure lasted between an hour and an hour and a half, during which time the full volume of Ernie's blood had to be replaced. When the

operation was over, McLone thought that Ernie would die within minutes or hours. McLone was experienced in identifying injuries caused by child abuse, and he told police detectives investigating the case that the attack on Ernie went beyond abuse. In his opinion, it was murder.

As it turned out, Ernie survived, but the swelling in his brain took weeks to subside, and Ernie remained comatose for approximately a month and a half. In the end, he was forced to stay at Children's Memorial for almost three months, during which time he had to undergo several additional surgical procedures. Ernie was subsequently sent to the Rehabilitation Institute of Chicago, but returned to Children's Memorial about six months later so that doctors could cover the hole left in his skull when the skull plate was originally removed.

Dr. McLone testified at trial that the intercranial injury Ernie received was as severe as he had ever seen. According to McLone, Ernie's injuries were compatible with a person of strength having repeatedly banged the boy's head on a floor. Because of the injuries, Ernie sustained a significant loss of brain mass. McLone predicted that the side of the brain where the injury occurred will eventually disappear completely. As a result, Ernie will always be partially paralyzed and will be mentally retarded. Half of his visual field will probably be lost, and his memory will be damaged.

Dr. Puliydil Phillip is in charge of the pediatric division of the brain trauma program at the Rehabilitation Institute of Chicago, where Ernie was sent after his surgery. Board certified in physical medicine and rehabilitation, Dr. Phillip testified that when Ernie first came to the Rehabilitation Institute for care, the left side of his body was paralyzed, he could not care for himself in any way, and he had no bowel or bladder control. The child was unable to stand without assis-

tance. He was no longer capable of feeding himself. Although he could say one or two words, his speech was not clear, and he was unable to form a sentence. In addition, he now suffered from a permanent mental handicap.

Following the attack, Ernie received a total of eight months of care at the Rehabilitation Institute. This was an extremely long stay. Normally, patients remain for only one to six months. During his eight months of rehabilitation, Ernie was given physical, occupational, and speech therapy. According to Dr. Phillip, Ernie had to be retrained to perform all of the basic skills he possessed prior to the attack. In Dr. Phillip's opinion, the injuries and their effects were consistent with someone of superior strength having taken Ernie's head and smashed it against the floor several times with extreme force. So profound was the trauma that Ernie could never fully recover.

In a signed statement that the jury was allowed to hear, Williams admitted that he had hit Ernie with a belt on many occasions and that he had punched the boy in the chest with his fist. He further admitted that during the period in question here, he did hit Ernie with the remote control device and did grab the boy and throw him down when he went to use the bathroom. Williams' statement indicated that these assaults caused Ernie to hit his head on the floor and on a cupboard, although it made no mention of Williams' having repeatedly held Ernie's head and pounded it against the floor.

Williams testified at trial and tried to disavow most of what was contained in his statement. He claimed that a police detective and State's Attorney had lied about incriminating statements he had made following his arrest. During his testimony, Williams suggested that it was Ernie's biological father, Erskine Wilson, who was actually responsible for the head trauma. Ac-

cording to Williams, Wilson had returned Ernie from a visit on the evening before he was rendered comatose, and the boy was already bruised at that time. Rebuttal evidence adduced by the State, however, showed that this was impossible. At the time Ernie was attacked, Wilson was in jail.

The jury rejected Williams' defense and found him guilty of attempt to commit murder. The trial court then sentenced him to an extended term of 60 years' imprisonment. In addition, the court indicated that it was going to recommend that the State's Attorney indict Williams for perjury. As indicated at the outset of this disposition, the appellate court reversed and remanded for a new trial. Although it rejected most of Williams' many arguments, the court held that two basic errors were committed in the circuit court.

First, the court found improper the State's cross-examination of Williams regarding (1) statements he had made to his parole officer about his prior employment and (2) statements he had made to his friend Tracy Miller about how Ernie was injured. (252 Ill. App. 3d at 715-17.) Although the appellate court's explanation for its position is not without ambiguity, the court's primary objection appears to be that the State did not properly "perfect" its impeachment of Williams. In other words, the court believed that the State should have offered evidence that Williams had in fact made certain statements that Williams did not admit to having made.

Without reaching the merits of the appellate court's reasoning, we note simply that the matter should never have been addressed. To preserve an issue for review, a defendant must both object at trial and include the issue in a written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) In this case, Williams' attorney made no objection at trial to the State's failure

to perfect the impeachment of his client. Although some objections were raised during the course of the State's cross-examination of Williams, as the appellate court's discussion shows (252 Ill. App. 3d at 714-16), none claimed that the State should have followed up its cross-examination with additional evidence. The problem was never mentioned. Because counsel failed to specify failure to perfect as grounds for his objection at trial, when the objection could have been addressed by the State and, if necessary, remedied, the appellate court should have deemed the issue waived. *People v. Lucas* (1992), 151 Ill. 2d 461, 481; see *People v. Fontana* (1993), 251 Ill. App. 3d 694, 701.

The second error found by the appellate court was that a witness for the State should not have been permitted to testify that Williams had once lifted a grown man off the ground and set him down in a chair, nor should the prosecuting attorney have been permitted to reiterate the witness' testimony about that incident. The testimony was improper, according to the appellate court, "because it represented a bad act" and was of questionable relevance. 252 Ill. App. 3d at 720.

Evidence of the commission of other crimes, wrongs or acts is inadmissible for the purpose of showing a disposition or propensity to commit crimes. (*Lucas*, 151 Ill. 2d at 485.) It may be admitted, however, if relevant to establish any material question other than the propensity to commit a crime. (*People v. Thingvold* (1991), 145 Ill. 2d 441, 452; *People v. Illgen* (1991), 145 Ill. 2d 353, 365.) When such evidence is offered, the trial judge must balance the relevance of the evidence against the prejudicial effect it might have on the defendant. The trial court's ruling as to the admissibility of the evidence will not be reversed absent a clear showing of abuse of discretion. *Thingvold*, 145 Ill. 2d at 452-53.

In this case, the trial court did not abuse its discretion in overruling defense counsel's objection to the evidence. The testimony was elicited not to establish Williams' propensity to commit a crime, but simply to illustrate his strength. Williams is not a large man. At the time of his arrest, he was only five feet, three inches tall and weighed 140 pounds. The prosecution wanted to show the jury that despite Williams' diminutive size, he possessed the physical strength necessary to inflict the debilitating brain damage Ernie sustained.

Nothing in the witness' testimony suggested that Williams had a tendency toward violence or a propensity to attack others. The witness simply related how she had seen Williams pick a man up and set him down in a chair. There is nothing inherently mean, violent, or "bad" about such an act, and the witness did not intimate that any brutality was involved.

If there was any suggestion of brutality, it was in the way the prosecutor reiterated what the witness had said. Where the witness related that Williams had set the man down, the prosecutor stated that Williams had thrown him down. Although the prosecutor's characterization may not have been entirely accurate, it drew no objection from defense counsel and was not raised in Williams' post-trial motion, circumstances which the appellate court has ignored. For the reasons previously discussed, the absence of a contemporaneous objection and the subsequent failure to include the matter in his post-trial motion should have precluded Williams from challenging the prosecutor's remark on appeal.

Because Williams did not raise his objections properly, the errors he alleges could be considered on review only if they rose to the level of plain error. The plain error rule is a limited exception to the waiver rule and may be invoked only where the evidence is closely balanced or where the error is so serious that it deprived the defendant of a fundamentally fair trial. (*People v.*

*Johnson* (1994), 159 Ill. 2d 97, 120.) Neither condition exists here. There is no basis for concluding that the alleged errors were of such a magnitude that Williams was denied a fair trial, and the evidence was not closely balanced.

In reversing and remanding for a new trial, the appellate court opined that without the challenged errors, there was not overwhelming proof that Williams possessed the specific intent required to sustain a charge of attempt to commit murder. (252 Ill. App. 3d at 723.) The appellate court fails to explain, however, how the allegedly improper impeachment had any bearing on the intent element of the State's case. The record indicates that the impeachment was not aimed at the question of why Ernie was beaten. It pertained, instead, to the more fundamental question of who caused Ernie's injuries.

Specifically, the impeachment was designed to discredit Williams' veracity in order to undermine his claim that Ernie's injuries were inflicted not by him, but by the child's biological father. On that issue, there was no uncertainty. The evidence overwhelmingly showed that the person responsible for beating Ernie nearly to death was Williams, not the father. This not even the appellate court denies. It is clear, therefore, that the allegedly improper impeachment had no effect on the outcome. With the impeachment or without it, the result of the trial would have been the same. Accordingly, even if one believed that the trial court should have conducted the proceedings differently, any resulting error was not only not plain error, it was harmless beyond a reasonable doubt. See *People v. Hayes* (1990), 139 Ill. 2d 89, 134-35.

We reach the same conclusion with respect to the challenged remark of the prosecutor. Contrary to the appellate court's view, neither that remark nor the testimony upon which it was based was integral to the

success of the State's case on the issue of intent. Even if no reference had been made to Williams' having previously picked up and thrown down a grown man, the evidence of his intent in this case would have been overwhelming.

To be found guilty of attempted murder, a defendant must be shown to have possessed the criminal intent to kill. (*People v. Harris* (1978), 72 Ill. 2d 16, 27.) Because intent is a state of mind, it can rarely be proved by direct evidence. As a result, this court has recognized that where intent is not admitted by the defendant, it can be shown by surrounding circumstances (*People v. Koshiol* (1970), 45 Ill. 2d 573, 578), including the character of the assault and the nature and seriousness of the injury (see *People v. Mays* (1992), 230 Ill. App. 3d 748, 756).

In discussing the proof necessary to satisfy the intent element of attempt to commit murder, this court has further held:

" 'Since every sane man is presumed to intend all the natural and probable consequences flowing from his own deliberate act, it follows that if one wilfully does an act, the direct and natural tendency of which is to destroy another's life, the natural and irresistible conclusion, in the absence of qualifying facts, is that the destruction of such other person's life was intended.' " *Koshiol*, 45 Ill. 2d at 578, quoting *People v. Coolidge* (1963), 26 Ill. 2d 533, 537.

Under these principles, Williams' intent to kill Ernie was established beyond any doubt. As set forth earlier in this opinion, the evidence showed that on the evening of July 23, 1987, Williams began a course of physical abuse against Ernie that ended the following morning only after the toddler was gripped by a seizure and lost consciousness. During the hours of persistent torture, Williams repeatedly held the little child's face and slammed his head against an uncarpeted hardwood floor. Still the boy survived. When Williams discovered

Ernie alive, but dazed, the next morning, he did not seek or summon help. Instead, he once again slammed the child's head against the floor over and over and over. So vicious were these attacks that Ernie would have died had it not been for heroic medical intervention by the neurosurgeon at Children's Memorial.

Against these facts, the challenged remark by the prosecutor was insignificant. Even if improper, it could not possibly have altered the outcome of the case. No sane adult, regardless of his strength or prior violence against others, would engage in such brutality against a two-year-old child and inflict such serious head injuries unless he meant to end the child's life. For counsel to now suggest that Williams was guilty only of excessive discipline strains the bounds of zealous advocacy. Williams did not base his defense at trial on the argument that he had some legitimate reason for doing what he did. As previously indicated, his theory was that Ernie's injuries were actually caused by someone else, namely, Ernie's biological father. That theory, however, was conclusively refuted. Any error with respect to the prosecutor's remarks was therefore harmless beyond a reasonable doubt.

Finally, Williams argues that he is entitled to a new trial based on an additional argument presented to, but not addressed by, the appellate court. According to Williams, the circuit court erred when it refused to allow Marvin Moore to testify that he trusted Williams with his children and allowed Williams to baby-sit them. Williams argued that he should be permitted to present this evidence because the State was allowed to show that he had previously mistreated Ernie. In Williams' view, this testimony was admissible to show that he was not the child hater depicted by the State.

We cannot accept this argument. Although a defendant is permitted to present proof of his good character

to show that he was unlikely to have committed the crime charged, he may do so only by introducing evidence of his general reputation. A defendant is not allowed to introduce evidence of specific acts of good conduct. (*Lucas*, 151 Ill. 2d at 484.) The circuit court was therefore correct in preventing Moore from testifying about how Williams baby-sat for his children.

For the foregoing reasons, the judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*