THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH MAGGETTE, Defendant-Appellant.

Fourth District    No. 4—98—0989

Argued October 13, 1999.—Opinion filed January 26, 2000.

Daniel D. Yuhas and John M. McCarthy (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Barney S. Bier, State's Attorney, of Quincy (Norbert J. Goetten, Robert J. Biderman, and Thomas R. Dodegge (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GARMAN delivered the opinion of the court:

Defendant Joseph Maggette was charged in the circuit court of Adams County with two counts of criminal sexual assault, two counts of criminal sexual abuse, and one count of residential burglary. 720 ILCS 5/12—13(a)(2), 12—15(a)(2), 19—3(a) (West 1996). The offenses were allegedly committed on or about June 4, 1998. Following a bench trial, defendant was convicted on both counts of criminal sexual assault, one count of criminal sexual abuse, and the count of residential

burglary. The trial court sentenced defendant on the criminal sexual assault and residential burglary convictions to a total of 30 years in prison, with all sentences to run consecutively. Defendant appeals, challenging the sufficiency of the amended information and the sufficiency of the evidence. We affirm in part and reverse in part.

## I. BACKGROUND

Counts I and V of the amended information charged defendant with criminal sexual assault. Count I alleged that defendant, knowing that the victim, G.J.S., was unable to give knowing consent, knowingly committed an act of sexual penetration with her, in that he placed the hand of G.J.S. on his penis. 720 ILCS 5/12—13(a)(2) (West 1996).

Count V alleged that defendant, knowing that G.J.S. was unable to give knowing consent, knowingly committed an act of sexual penetration with her, in that he rubbed the vagina of G.J.S. through her clothing with his finger. 720 ILCS 5/12—13(a)(2) (West 1996).

Counts II and III charged defendant with criminal sexual abuse (720 ILCS 5/12—15(a)(2) (West 1996)). Count II alleged that defendant, knowing that G.J.S. was unable to give knowing consent, committed an act of sexual conduct with her, in that he knowingly fondled the breasts of G.J.S. for the purpose of his sexual arousal. Count III alleged that defendant fondled the vagina of G.J.S. through her clothing for the purpose of his sexual arousal.

Count IV charged defendant with residential burglary, in that he knowingly and without authority entered the dwelling place of L.F. with the intent to commit therein the offense of criminal sexual assault. 720 ILCS 5/19—3(a) (West 1996).

The cause proceeded to a bench trial on October 23, 1998. G.J.S. testified that in June 1998, she worked as a housekeeper at the Hotel Elkton (Elkton), where defendant resided. G.J.S. had seen defendant before when he worked at Quincy Recycle and he would wave or speak to her or her husband. During the time defendant lived at the Elkton, he followed G.J.S. around the hotel while she was working, asking questions about her and expressing an interest in having "more than a friendship relationship" with her. G.J.S. told defendant from the beginning that she could only offer him friendship. He told her that he wanted to have an affair with her. G.J.S. repeatedly told defendant that she was married and intended to be faithful to her husband and that she did not want to have an affair with him.

G.J.S. testified that on the afternoon of June 3, 1998, she went to the apartment of her friend, L.F. They were making plans to celebrate the twenty-first birthday of L.F.'s son with ice cream and cake. While G.J.S. was there, defendant came to the apartment and was allowed

inside. L.F.'s son failed to show up and G.J.S. and L.F. made plans to go out for a "ladies night." Defendant was not invited to go with them. G.J.S. went home and returned to L.F.'s apartment around 7:30 p.m., with a bowl of chili to eat later for supper.

G.J.S., L.F., and two of their friends went to a tavern called the Branding Iron. G.J.S. did not see defendant there. She drank two beers and one or two mixed drinks. They left and went to another tavern called the Oasis. She drank more beer there. Again, she did not see defendant. She stayed at the Oasis for approximately two hours. She and her friends were planning to go to another tavern called Port's Place, located two buildings away from the Elkton. However, because G.J.S. was tired, she decided to go back to L.F.'s apartment, get something to eat, and then return to Port's Place. L.F. gave G.J.S. the key to her apartment, and G.J.S. let herself into the apartment. She did not recall locking the door. She decided to lie down and rest before fixing something to eat. She fell asleep.

G.J.S. thought she was dreaming about being with her husband when she felt someone kissing her and sucking her breast. She felt herself being caressed in her vaginal area and her hand rubbing a penis. The first time G.J.S. saw defendant, he was "laying over" her and his hand was on her vagina, his penis was out and her hand was on it. Defendant's other hand was taking her hand and rubbing it on his penis. G.J.S. was wearing a jumpsuit that zipped and buttoned all the way down the front of the suit. Both the zipper and the buttons were undone. Her bra was pulled up over her breasts. Her panties were still on and defendant was rubbing her vagina over her panties. G.J.S. shouted at defendant and ordered him to leave the apartment. After defendant left, G.J.S. locked the apartment door, went into the bathroom, locked that door, undressed, and bathed herself repeatedly. Defendant called the apartment wanting to talk to her and G.J.S. hung up on him. Later, he knocked on the door, but she ignored him and stayed in the bathroom. L.F. came back to the apartment and found G.J.S. crying in the bathroom. At no time did G.J.S. give defendant permission to touch her in any way. She continued working at the Elkton for a while after the incident, but she eventually quit because it was too stressful being there.

On cross-examination, G.J.S. testified that she felt defendant's fingers caressing her vaginal area over her jumpsuit, and both over and underneath her underwear.

L.F. testified that she saw defendant sitting at the bar while she and G.J.S. were at the Branding Iron. She did not see defendant at the Oasis. L.F. drank only a glass and a half of beer during the evening. She was not intoxicated at all. G.J.S. was "well bent."

While L.F. was in Port's Place, defendant approached her and asked G.J.S.' location. L.F. told him G.J.S. was in her apartment and she should be back soon. Defendant said he was going to call G.J.S. L.F. did not give defendant permission to enter her apartment. Defendant later returned to Port's Place and L.F. asked him where G.J.S. was. He said she was in the apartment. L.F. decided to check on G.J.S. She knocked on the door of her apartment, but G.J.S. would not let her in. L.F. obtained a spare key and went inside. G.J.S. was locked in the bathroom and L.F. had difficulty talking her into opening the door. When G.J.S. did open the door, L.F. saw that G.J.S. was upset and crying. Her clothes were unzipped and she was washing her hands and cleaning herself off. She had lipstick smeared on her. She was shaking as L.F. got her out into the living room. They went back to Port's Place and defendant was still there. L.F. "was going after him," but some of her friends restrained her. She shouted out what defendant had done to G.J.S., and defendant said he did not do it and he did not know what L.F. was talking about.

Bryan Dusch, investigator from the Quincy police department, testified that he interviewed G.J.S. and defendant. Defendant stated he saw L.F. at Port's Place about 1:45 a.m.; he had just gotten off work at Ruby Tuesdays at 1:30 a.m. He stayed at Port's Place for 10 or 15 minutes, then left and went to his apartment to go to bed. Defendant stated he did not go back to Port's Place that same night. He admitted knowing G.J.S. and said the last time he spoke with her was at L.F.'s apartment at 3 p.m. on June 3. Defendant said that when he saw L.F. in Port's Place, he asked where G.J.S. was and L.F. said she was in L.F.'s apartment and that she was intoxicated. Defendant initially stated that L.F. told him at Port's Place to "leave her alone and not come to her door anymore and also to again leave her alone or she would have him arrested." Defendant denied knowing why L.F. was upset with him.

Defendant at first told Dusch that he left Port's Place to speak to some friends outside. He later said he had seen G.J.S. at L.F.'s apartment, they talked for a short while, and he left and went to his own apartment. He knocked on the door of L.F.'s apartment and G.J.S. told him to come in. She was sitting on the couch. Initially, defendant said that G.J.S. told him she was intoxicated and sick and he left. He then said he returned to Port's Place and had the conversation with L.F. Defendant at first denied any sexual contact with G.J.S. Subsequently, he began to cry and told Dusch that he had kissed G.J.S. on the lips and neck. She told him she did not want to cheat on her husband and he left. Dusch arrested defendant following the interview.

After the State rested, defense counsel moved for a directed verdict

on all five counts of the amended information. As to the criminal sexual assault counts, counsel alleged the evidence did not show a lack of knowing consent on G.J.S.' part. Counsel further argued the State was trying to enhance sexual conduct, as defined by statute, into penetration. Counsel contended that a rubbing or touching of the vagina is not penetration and counsel maintained that the State presented no evidence of penetration. The prosecutor argued that a hand is an object for purposes of sexual penetration and that, by causing G.J.S.' hand to rub his penis, defendant used her hand as an object in sexual penetration. The trial court denied the motion for directed verdict.

Defendant testified that on or about June 4, 1998, he worked at Days Inn in the morning and at Ruby Tuesdays in the evening. When he got off work at 1:30 a.m., he first went to his apartment, then decided to go to Port's Place to have a beer. He saw L.F., who was intoxicated. She told him that G.J.S. was looking for him and was at L.F.'s apartment. Defendant left Port's Place and went to L.F.'s apartment to see what G.J.S. wanted. G.J.S. answered the door when he knocked. They "touched" and G.J.S. hugged and kissed him. They sat on the couch. He could tell G.J.S. was intoxicated, because she was more affectionate than usual. As they sat there, he hugged her and kissed her neck. She rubbed between his legs and they talked. She said she found him attractive, but she cheated on her husband once before and did not want to do it again. Defendant left and went to Port's Place and stood outside with some friends as it was getting ready to close. Defendant denied undressing G.J.S. or committing the acts alleged.

On cross-examination, defendant denied that G.J.S. told him she did not want a sexual relationship with him. She had told him she did not want to cheat on her husband. However, defendant had taken her home after work several times and she would hug him before getting out of the car. For this reason, he did not interpret G.J.S.' statements about not wanting to cheat on her husband as a "no." After leaving L.F.'s apartment on June 4, 1998, he went back to Port's Place to finish the beer he had left when he went to L.F.'s apartment. L.F. left as he entered. She came back in later and started arguing and cursing at him, telling him to stay away from her and her apartment or she would have him arrested. He said okay and left.

L.F. testified in rebuttal that she was not intoxicated nor did she tell defendant in Port's Place that G.J.S. was looking for him.

G.J.S. testified in rebuttal that she did not tell L.F. or anyone else that she was looking for defendant on the night of the incident. She never hugged defendant at any time prior to June 4, 1998. She did not

let defendant into L.F.'s apartment during the early morning hours of June 4. She did not voluntarily hug or kiss defendant on that occasion nor did she voluntarily touch him in any way. She was both tired and intoxicated that night.

After hearing arguments of counsel, the trial court found defendant guilty on count I (criminal sexual assault), count III (criminal sexual abuse), count IV (residential burglary), and count V (criminal sexual assault). The court acquitted defendant on count II (criminal sexual abuse, relating to fondling G.J.S.' breasts) because the evidence regarding that conduct came in the form of a dream G.J.S. thought she was having.

Defense counsel filed a posttrial motion in which he alleged as to the residential burglary conviction, that the evidence failed to show defendant had the requisite intent to commit criminal sexual assault when he entered L.F.'s apartment. Counsel also argued that the evidence failed to show that any sexual penetration occurred and therefore the criminal sexual assault convictions should be vacated. The trial court denied the motion. The court determined that count III (criminal sexual abuse regarding defendant's hand fondling G.J.S.' vagina) was an included offense of count V (criminal sexual assault regarding defendant's finger rubbing G.J.S.' vagina) and the judgment on count III was vacated.

On December 2, 1998, the court entered a written order of judgment and sentence, imposing prison sentences of 8 years on count I, 10 years on count IV, and 12 years on count V, all to run consecutively. This appeal followed.

## II. ANALYSIS

Defendant first argues on appeal that the amended information is defective by charging him in counts I and V with the elements of criminal sexual abuse, but calling the charges criminal sexual assault. Thus, defendant argues, even if the State proved the elements contained in those counts, defendant was at most guilty of criminal sexual abuse and his convictions for criminal sexual assault cannot stand.

■ When the sufficiency of an indictment or information is challenged for the first time on appeal, as here, we need only determine whether the charging instrument apprised the defendant of the precise offense charged with enough specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct. *People v. Thingvold*, 145 Ill. 2d 441, 448, 584 N.E.2d 89, 91 (1991). To prevail on a challenge to the sufficiency of a charging instrument raised for the first time on appeal, the defen-

dant must show that the defect actually prejudiced him in preparation of his defense. *Thingvold*, 145 Ill. 2d at 448, 584 N.E.2d at 91.

■ Section 12—12(e) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12—12(e) (West 1996)) defines the term "sexual conduct" as:

> "any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus[,] or breast of the victim or the accused, or any part of the body of a child under 13 years of age, for the purpose of sexual gratification or arousal of the victim or the accused."

■ The term "sexual penetration" is defined by section 12—12(f) of the Criminal Code (720 ILCS 5/12—12(f) (West 1996)) as follows:

> "any contact, however slight, between the sex organ or anus of one person *by an object*, the sex organ, mouth[,] or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio[,] or anal penetration." (Emphasis added.)

The legislature amended section 12—12(f) of the Criminal Code in Public Act 88—167 (Pub. Act 88—167, § 5, eff. January 1, 1994 (1993 Ill. Laws 2113, 2114)), adding the phrase "by an object" to the first clause of section 12—12(f). A literal reading of the statute would suggest that any contact, however slight, between the sex organ or anus of one person and any object would constitute sexual penetration.

The parties have not cited and we have not found any cases interpreting the term "object," as added by the amendment to section 12—12(f) of the Criminal Code, in the manner the State does. The State argues that if a finger is an object, then certainly a hand is also an object and the definition of "sexual penetration" is satisfied. It cites *People v. Scott*, 271 Ill. App. 3d 307, 314, 648 N.E.2d 86, 90 (1994), where the defendant was convicted of aggravated criminal sexual assault on a theory of accountability when he ordered the victim to insert her finger into her own vagina. The appellate court reversed defendant's sexual assault conviction due to serious errors in the jury instructions, but in doing so held that a finger is an "object" for purposes of committing an act of sexual penetration. The court also stated during the course of its analysis that it would have no hesitancy in holding that a hand inserted into a victim's vagina is an object, even where it is the victim's own hand.

*Scott* does not support the State's argument because, in that case, there was an actual intrusion into the victim's vagina. Here, we have allegations of causing G.J.S.' hand to be placed on defendant's penis and of rubbing her vagina with defendant's finger. We must therefore

ascertain the meaning of the term "object" in section 12—12(f), as it relates to contact with a victim's sex organ or anus.

> "The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 81, 630 N.E.2d 820, 822 (1994); *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189, 561 N.E.2d 656, 661 (1990). The words of a statute are given their plain and commonly understood meanings. *Forest City Erectors v. Industrial Comm'n*, 264 Ill. App. 3d 436, 439, 636 N.E.2d 969, 972 (1994). Only when the meaning of the enactment is unclear from the statutory language will the court look beyond the language and resort to aids for construction. *Solich*, 158 Ill. 2d at 81, 630 N.E.2d at 822." *R.L. Polk & Co. v. Ryan*, 296 Ill. App. 3d 132, 139-40, 694 N.E.2d 1027, 1033 (1998).

■ A statute must be read as a whole, with all of its relevant provisions considered together. Statutes are to be construed to give full effect to each word, clause, and sentence, so that no part of the statute is rendered surplusage or void. *Houlihan v. City of Chicago*, 306 Ill. App. 3d 589, 594, 714 N.E.2d 569, 572 (1999).

■ If we accepted the State's interpretation of the term "object" in the first clause of section 12—12(f), then the second clause of that section would become mere surplusage. No intrusion into the sex organ or anus of the victim would need to be proved as all that would have to be shown is mere contact. In addition, the State's interpretation of the term "object" in the first clause of section 12—12(f) would result in the dilution of section 12—15(a) of the Criminal Code. That statute, defining the offense of criminal sexual abuse, would become all but useless, except in cases involving contact with the victim's breasts. Faced with a choice between charging criminal sexual abuse or criminal sexual assault, prosecutors will be more likely to charge the greater offense. We do not believe that the legislature intended its amendment of section 12—12(f) to have such far-reaching effects. A statute should be read in such a manner that none of its parts are rendered useless or mere surplusage. Accepting the State's position in this case would require us to disregard this important rule of statutory construction.

Further legislative history supports our interpretation of section 12—12(f) of the Criminal Code. In discussion of the proposed amendment in the House of Representatives, the following exchange took place between Representative Dart and Representative Johnson, sponsor of the bill:

> "Dart: 'Representative, what ... was there a problem or a court case that required this change in the law?'

Johnson, Tom: 'Yes. The [S]tate's [A]ttorney[']s office in Cook County brought this to the attention of myself, and it was behind this Bill, and evidently they were having some problems as it related to the use of objects such as vibrators, et cetera, in the performance of sex acts against children.'

Dart: 'Was there a ... I mean like a specific court ruling or anything that required the language to be changed?'

Johnson, Tom: 'As I understand it from the [S]tate's [A]ttorney[']s office, yes[,] the courts were reluctant to convict where objects such as these were used on children. Instead, they were talking about going to battery and those types of offenses as opposed to the sex crime.' " 88th Ill. Gen. Assem., House Proceedings, April 27, 1993, at 102-03.

Accordingly, we hold that neither a finger nor a hand is an "object" for purposes of contact between the sex organ or anus of one person and an object.

■ Defendant is therefore correct that counts I and V of the amended information were improperly charged. However, defendant has failed to show how the defect prejudiced his ability to prepare a defense to the charges. Despite the error in charging criminal sexual assault, counts I and V of the amended information adequately informed defendant of the kind of sexual contact he was alleged to have initiated. We further note that defendant's strategy at trial was to deny that he touched G.J.S. in any of the ways alleged. Thus, we reject defendant's argument that he was prejudiced at trial by the manner in which counts I and V of the amended information were charged.

Defendant was, however, improperly convicted of the two counts of criminal sexual assault. The State presented no evidence of any intrusion into G.J.S.' vagina by defendant's hand or finger. Mere touching or rubbing of a victim's sex organ or anus with a hand or finger does not prove sexual penetration and cannot, therefore, constitute criminal sexual assault. Similarly, placing a victim's hand on a defendant's penis does not constitute sexual penetration under section 12—12(f) of the Criminal Code. Accordingly, defendant's convictions on counts I and V of the amended information must be reversed.

Defendant next argues that the State failed to prove him guilty beyond a reasonable doubt of residential burglary, because the evidence was insufficient to show that he entered L.F.'s apartment with the intent to commit a felony.

Where the sufficiency of the evidence is challenged, a reviewing court will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt

of the defendant's guilt." *People v. Brown*, 185 Ill. 2d 229, 247, 705 N.E.2d 809, 817 (1998). The test to be employed on review is " 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.' " *People v. Howery*, 178 Ill. 2d 1, 38, 687 N.E.2d 836, 854 (1997), quoting *Jackson v. Virginia*, 443 U.S. 307, 318, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89 (1979).

■ The offense of residential burglary is committed when one knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft. 720 ILCS 5/19—3(a) (West 1996).

■ Intent can rarely be shown by direct evidence because it is a state of mind. *People v. Williams*, 165 Ill. 2d 51, 64, 649 N.E.2d 397, 403 (1995). Intent may, however, be inferred from surrounding circumstances (*Williams*, 165 Ill. 2d at 64, 649 N.E.2d at 403) and may be proved by circumstantial evidence (*People v. Mitchell*, 238 Ill. App. 3d 1055, 1061, 605 N.E.2d 1055, 1060 (1992)). In determining whether the evidence is sufficient to permit the inference of intent, the relevant circumstances include the time, place, and manner of entry into the premises; the defendant's activity within the premises; and any alternative explanations offered for his presence. *People v. Richardson*, 104 Ill. 2d 8, 13, 470 N.E.2d 1024, 1027 (1984). Determination of the question of intent is for the trier of fact and will not be disturbed on review unless a reasonable doubt exists as to the defendant's guilt. *People v. Ybarra*, 272 Ill. App. 3d 1008, 1011, 651 N.E.2d 668, 671 (1995).

Defendant points out that he knew both G.J.S. and L.F. He had been in L.F.'s apartment the previous afternoon. He argues that to the best of his knowledge, G.J.S. was awake and cooking something to eat when he went to L.F.'s apartment. He could not have known G.J.S. was asleep on the couch until after he opened the door and entered.

The State argues the evidence was sufficient to convict defendant and notes the following factors tending to show defendant's intent: (1) defendant made repeated advances to G.J.S. that she rejected; (2) defendant went to L.F.'s apartment at 2 a.m., knowing G.J.S. was there alone; (3) defendant entered the apartment without permission; and (4) the trial court concluded defendant saw G.J.S. asleep on the couch at the time of entry.

■ Although defendant did not actually commit a felony while in L.F.'s apartment, this fact alone does not require a finding that he did not *intend* to commit a felony. The trial court, as fact finder, could have reasonably concluded from the evidence that defendant (1) made repeated advances toward G.J.S., (2) went to the apartment knowing G.J.S. was there alone and intoxicated, (3) did not have L.F.'s permis-

sion to enter the apartment, and (4) saw G.J.S. asleep on the couch when he entered the apartment. Under these circumstances, any rational trier of fact could have found that defendant had an intent to commit a felony at the time he entered the apartment.

## III. CONCLUSION

For the reasons stated, defendant's criminal sexual assault convictions are reversed. His conviction for residential burglary and sentence thereon are affirmed.

Affirmed in part and reversed in part.

STEIGMANN and McCULLOUGH, JJ., concur.