2023 IL App (1st) 210577-U

No. 1-21-0577

Order filed March 15, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 13958 |
| | ) | |
| EDWIN REA, | ) | Honorable |
| | ) | Steven J. Goebel, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's convictions for attempted murder and armed robbery over his challenge to the sufficiency of the evidence of his specific intent to kill the victim and that he took the victim's property.

¶ 2   Following a bench trial, defendant Edwin Rea was found guilty of one count of attempted murder, one count of armed robbery, and two counts of aggravated battery.[1] The trial court merged

---

[1] Defendant and Javier Lopez Jr. had simultaneous severed bench trials. In the trial testimony, Javier Lopez Jr. was also identified as "Javier Lopez." He is not a party to this appeal.

the aggravated battery counts into the attempted murder count, and imposed concurrent 16-year prison terms for attempted murder and armed robbery. On appeal, defendant contends there was insufficient evidence of his specific intent to kill the victim or that he took property from the victim. We affirm.

¶ 3    Defendant was charged by indictment with multiple offenses against the victim Joshue Portillo following an incident on August 21, 2017.[2] The State proceeded on counts for attempted murder predicated on shooting Portillo (count I) and striking him about the body (count II); aggravated battery predicated on shooting Portillo (count III), causing him great bodily harm by means other than discharging a firearm (count VIII), and causing bodily harm with a deadly weapon, a bat (count IX); and armed robbery of Portillo while armed with a dangerous weapon, a bat (count IV) and a firearm (count V).

¶ 4    Portillo testified that on the evening of August 21, 2017, a woman named Valerie Munoz drove him to Challenger Park in Streamwood. Once there, Munoz said she had to make a phone call, so they exited the vehicle, a gold Toyota Camry. Portillo walked to the front of the vehicle and heard someone say, " 'What's up, mother***.' " Portillo turned and "glimpse[d]" two "male Hispanics" running toward him. Portillo ran, but after "[t]wo steps" he was hit on the lower back with a long wooden object. He fell facedown and covered his head with his hands. For two to five minutes, he was repeatedly struck on the head, arm, and lower back. Portillo next remembered seeing a red vehicle, being asked if he needed medical attention, and going to a hospital.

_____

[2] Although the indictment identified the victim as "Joshua Portillo," at trial he spelled his first name as "Joshue."

¶ 5     Although Portillo was initially too disorientated to speak to the police, he later told officers that Munoz, with whom he had an "ongoing issue," brought him to the park. At trial, Portillo explained that he posted pictures of Munoz on Craigslist because she said he raped her. Portillo denied raping Munoz, although they had "sex a couple times." They were not in a relationship because Munoz had a "baby daddy."

¶ 6     During his five-day stay at the hospital, Portillo underwent multiple x-rays and the police photographed his injuries. Portillo identified photographs of his injuries, which were admitted and published, and are included in the record on appeal. This court has viewed the photographs. One photograph depicts a man's head; the forehead is bloody and stitched, and blood is pooled in an ear. The second photograph depicts an arm, shoulder, and back bearing red marks. A third photograph depicts a man on a bed wearing a cervical color with bloodstains surrounding his head. Other photographs show a closeup of a man's bloody head in a pool of blood and a red mark above a buttock.

¶ 7     At trial, Portillo showed the court a scar on the left side of his temple and stated that, as a result of this incident, he was partially deaf in his left ear. When he went to the park, Portillo had a cellphone, marijuana, identification, and "some change" in his pocket. When he arrived at the hospital, neither the phone nor the marijuana were in his pocket.

¶ 8     During cross-examination, Portillo did not remember telling police that he walked to meet Munoz, but asserted that he told the police that the men said, " 'Hey, mother***.' " Munoz wanted to smoke marijuana with him and did not indicate that she knew he put her name and phone number on Craigslist. Portillo did not know whether she knew what he had done, but he believed that Munoz told her baby's father that Portillo raped her. Portillo did not immediately see the men

approaching because it was dark. He did not recognize them and could not identify them. Portillo did not see whether the men wore something on their heads or how many bats were involved. He did not see a firearm or hear a gunshot.

¶ 9 During redirect, Portillo testified that he was hit with a long wooden object and went in and out of consciousness. While hospitalized, he was treated for a gunshot wound.

¶ 10 Sabrina Burd testified that her property abutted Challenger Park. She and her husband were on their deck on the evening of August 21, 2017, when she heard a man yelling. Burd approached the fence, and heard screaming and a "board" being repeatedly hit "against a building really hard." She believed the sound was coming from a nearby parking area, but could not "make out people." At one point, Burd believed she heard three gunshots. She then retrieved binoculars and gave them to her son, who thought he saw someone on the ground. After Burd saw a vehicle leave, Burd and family members drove to the parking area, discovered a man on the ground, and called 911. She later spoke to the police, but did not remember what she told the 911 operator.

¶ 11 McHenry County deputy sheriff Benjamin Steinmetz testified that, in August 2017, he worked for the Streamwood police and responded to a call of a man on the ground in a park. The caller reported hearing "two loud pops" and what "sounded like" a man being beaten. Steinmetz spoke to the 911 caller, walked into the park, and located a man on the ground. The man had a "large amount" of blood on his shirt, arms, and head, and several "gashes" to the back of the head. One gash on the back left side of the head was "at least an inch long." When Steinmetz approached, he was unsure if the man was alive. The man had difficulty answering Steinmetz's questions, spoke with "slurred" speech, and "seemed semiconscious," but indicated that his arm hurt. Once

paramedics arrived, Steinmetz and other officers looked for shell casings, bullets, and weapons, but did not find any.

¶ 12    William Neal testified that he had prior convictions for theft and obstructing identification. Neal was charged in this case, but agreed to testify in exchange for consideration from the State.

¶ 13    On August 21, 2017, Neal received a Snapchat message from Javier Lopez, asking him to come to Munoz's house. There, Neal met Lopez, Munoz, and defendant, whom he identified in court. Between 7 and 7:30 p.m., Neal and Lopez discussed "robbing someone for weed" and that Munoz would call the intended target. One of them asked Neal if he had a firearm. Neal answered affirmatively, but did not actually possess a firearm. Neal observed defendant place two wooden baseball bats in the trunk of Munoz's vehicle, a Camry.

¶ 14    Defendant, Lopez, and Munoz drove the Camry to a gas station, and Neal drove there in a separate vehicle. At the gas station, Neal noticed the "butt" of a small .38-caliber revolver on Lopez's left hip. Afterward, defendant, Lopez, and Munoz drove the Camry toward Streamwood while Neal drove toward Carol Stream. He did not go to the park with defendant, Lopez, and Munoz.

¶ 15    Later that night, Neal saw defendant and Munoz "shooken up." Defendant said that they "beat" a man and "left him leaking." Neal explained that "leaking" meant bleeding. Neal told defendant they would "go down for this." Thereafter, at Munoz's home, Neal observed blood on defendant's shoes. Defendant again stated that he left a man "leaking," and then burned the shoes. Later, Neal went to Lopez's home and saw a Samsung phone. When Neal asked about the phone, Lopez responded that it was "the guy's phone that they took." Defense counsel objected, and the court overruled the objection.

¶ 16    Neal then testified that when he asked Lopez what happened, Lopez replied that "they" beat a man, and that Lopez "shot him in the head." Neal told Lopez that they would "go down." Lopez then stated that "they use[d] the bats." Defense counsel objected, arguing that these statements occurred after the fact and not in furtherance of any conspiracy. The court ruled that the statements would not be considered against defendant.

¶ 17    Neal admitted that he gave several versions of events to the police, but asserted he was depressed, anxious, and "badgered by [the] police" so he told them what "they wanted to hear." He denied having a firearm and knowing the events would "go down like that."

¶ 18    During cross-examination, Neal acknowledged that no one told him there would be a fight or a robbery. He did not know that anyone would be hurt; rather, he thought "they" would "get weed from this guy." No one told him Portillo raped Munoz and put her information on Craigslist. Neal did not give anyone a firearm, and reiterated that he only told the police what they wanted to hear. Defendant never gave Neal "details," but just stated that defendant beat a man and "left him leaking." Defendant never said that he shot anyone.

¶ 19    Streamwood police detective Colin Klein testified that on August 21, 2017, he spoke with Burd, her family, and Portillo. During the course of three conversations with Portillo, Klein learned Munoz's name. He then spoke to Munoz and obtained consent to search a Toyota Camry. Afterward, he arrested defendant and Lopez. Klein spoke to defendant several times at the police station. On August 24, 2017, defendant made a statement on video. The video footage was admitted, portions were published, and the footage is included in the record on appeal.

¶ 20    This court has viewed the footage. Therein, defendant states that he "guess[ed]" someone was hurt, but did not know what happened. Defendant then states that a "kid" named "Josh"

(Portillo) was harassing defendant's fiancée (Munoz), who was the mother of defendant's children, and telling her, "I wanna be with you." Although Munoz said she was not interested, Portillo pursued her, slept in her vehicle, and raped her. Munoz then changed her phone number, but Portillo obtained the new number and published it on Craigslist. Defendant was upset that Portillo did not "get the message." Defendant accompanied Munoz when she went to tell Portillo to leave them alone. At the meeting, Portillo tried to talk to Munoz, but defendant told Portillo to leave Munoz alone and that Munoz wanted "nothing" to do with Portillo. When Portillo did not "get the message," the men fought.

¶ 21    In his statement, defendant initially asserted that he only used his fists and feet during the fight, and "didn't want to kill" Portillo. Defendant later stated that maybe a "rock" or "something" was used. Defendant also stated that he and Lopez went to the park, that Lopez also used his fists, and that when defendant left the park, Portillo was bleeding "a little bit." Defendant left in a gold Toyota that belonged to Munoz's mother. He later cleaned blood off the vehicle. Defendant denied taking Portillo's phone.

¶ 22    Defendant later stated that Lopez had a bat, but he did not think Lopez used it. After a police officer asked defendant to tell "the honest truth," defendant stated that he struck Portillo three times with a bat, but denied having a firearm. Defendant did not know who brought the bats or what happened to them. He stated that Portillo, who "raped [his] girl," could have "done it" to defendant's children. Defendant reiterated that no firearms were involved.

¶ 23    During cross-examination, Klein stated that no firearm was recovered during the investigation. During a conversation at Portillo's home, Portillo stated that he went to the park on his own, he was assaulted by two Hispanic men who did not say anything, and he dropped his cell

phone while running away. Klein acknowledged that defendant initially denied striking Portillo. However, about 40 hours after his arrest, defendant admitted involvement. Klein denied telling defendant that Munoz would get in trouble if defendant did not take responsibility. Defendant never stated that he intended to kill Portillo, or that there was a plan to rob Portillo.

¶ 24    Klein acknowledged that when he interviewed Neal, Neal gave several versions of events over the course of the interview, including who possessed a firearm and how many firearms were present. Neal originally stated that he possessed a firearm, then stated that he did not. Neal also initially stated that defendant did not share details about the incident, then stated that defendant did.

¶ 25    Dr. Szymon Rosenblatt, a neurosurgeon, testified that Portillo arrived at the hospital with a "gunshot wound to the head." Portillo was "slightly drowsy," but "easily arousable," and complained of a headache and pain to the right arm. Dr. Rosenblatt observed bloody drainage from the left ear, and lacerations to the "frontal area" and back of the left side of the head. There was tissue swelling around the left ear and fractures to the left temporal bone, posterior fossa, and the posterior wall of the left sphenoid sinus. There was also a fracture around the area where the "main artery to the brain travels to the bony channel," which suggested an "injury to the left internal carotid artery." Dr. Rosenblatt could not say "for sure" whether Portillo's injuries were caused by a gunshot wound or blunt trauma. He suggested Portillo see a specialist for the sinus injuries, and saw Portillo two months later for a follow-up visit.

¶ 26    During cross-examination, Dr. Rosenblatt acknowledged that, although the "original report" noted a gunshot wound, he did not observe a powder burn or bone splintering and Portillo did not recall what happened.

¶ 27    Streamwood police department evidence technician Brian Kustra testified that August 24, 2017, he processed a gold Toyota Camry at an address in Hanover Park. Kustra located nine stains inside the vehicle which tested positive for blood.

¶ 28    The State entered a stipulation that a forensic scientist would testify that five of the samples taken from the Camry tested positive for Portillo's DNA.

¶ 29    Defendant moved for a directed finding arguing, relevant here, that the evidence did not establish that he specifically intended to cause Portillo's death or participated in a "preexisting plan" to commit a robbery.

¶ 30    The trial court stated that even in the light most favorable to the State, the court did not believe that Portillo was shot or that defendant or Lopez carried a firearm. The court therefore entered a directed finding as to count I for attempted murder, count III for aggravated battery, and count V for armed robbery, which alleged that defendant committed the offenses while armed with a firearm.

¶ 31    In closing argument, the State asserted that defendant and Lopez hit Portillo repeatedly with baseball bats and "left him for dead in a pool of his own blood." Defendant and Lopez made a plan, had weapons, hid in the park, and struck Portillo for two to five minutes. There was ample evidence that defendant and Lopez "severely beat" Portillo, including defendant's statement that he hit Portillo multiple times with a bat and Dr. Rosenblatt's testimony that Portillo suffered multiple skull fractures. The State concluded that these "vicious actions," and Portillo's injuries, unquestionably established that defendant committed attempted murder as one does not beat a person to "this extent" without an intent to kill.

¶ 32    The defense argued that no evidence established how many times Portillo was struck, and Portillo failed to provide "any" credible details. Dr. Rosenblatt testified that Portillo did not remember what happened, and Portillo merely gave the court a "story" of what he believed happened. Even at face value, however, Portillo's testimony was insufficient to find defendant responsible. Counsel further argued there was no credible evidence that defendant planned to rob Portillo, and that Neal's testimony had "zero import" because he would "say anything." Moreover, defendant never said that he intended to kill or rob Portillo, and no evidence showed that a robbery occurred.

¶ 33    In rebuttal, the State argued that the law did not require an explicit statement of intent in an attempted murder case; rather, the evidence must establish intent, which in this case came from defendant and Lopez bringing bats to the park, beating Portillo until his head "cracked *** open like *** an egg," and leaving him "for dead."

¶ 34    In finding defendant guilty of attempted murder, aggravated battery, and robbery, the trial court noted there was "no question" Portillo was hit "numerous times" in the head during a brutal beating. Although Neal was not the "most credible witness," he testified that defendant and Lopez were present for a discussion of a robbery, and the court believed that Munoz called Portillo and "set [him] up." Additionally, defendant told Neal that he beat Portillo and left him "leaking blood," which aligned with defendant's admission that he hit Portillo at least three times with a bat. The court found Neal's testimony that defendant burned his bloody shoes, and that Lopez had a Samsung phone in Lopez's garage, to be credible.

¶ 35    Defendant filed a motion and amended motion for a new trial, alleging, relevant here, that insufficient evidence showed that a robbery occurred or that he had the specific intent to kill

Portillo. Trial counsel argued that the evidence failed to explain whether the cell phone and cannabis were lost or taken. After argument, the trial court denied defendant a new trial finding, in pertinent part, that striking someone "numerous times about the head" was an attempt to kill and a "conspiracy" existed to rob and beat Portillo.

¶ 36    At sentencing, the trial court merged the aggravated battery counts into the attempted murder count, and imposed concurrent 16-year prison terms for attempted murder and armed robbery. Defendant filed a motion to reconsider sentence, which the trial court denied.

¶ 37    On appeal, defendant contends that he was not proven guilty of attempted murder and armed robbery when there was insufficient evidence of his specific intent to kill Portillo or that he took property from Portillo.

¶ 38    When reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *Id.* "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *Id.* A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 39    First, defendant alleges that insufficient evidence established his specific intent to kill Portillo. Defendant argues that, although Portillo suffered injuries that could "possibly be

described as serious," he did not suffer a brain injury or require surgery. Defendant also notes that he never threatened to kill Portillo.

¶ 40    To sustain a conviction for attempted murder, the State must prove beyond a reasonable doubt that the defendant (1) performed an act constituting a substantial step toward the commission of the murder, and (2) possessed the criminal intent to kill the victim. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016); *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. Further, "[b]ecause attempted murder is a specific intent offense, it must be proven [the] defendant had the specific intent to kill." *Id*. Because intent is a state of mind, however, it is rarely proven through direct evidence. *People v. Williams*, 165 Ill. 2d 51, 64 (1995).

¶ 41    Proof of specific intent " 'may be inferred from the circumstances, such as the character of the assault on the victim and the use of a deadly weapon.' " *Viramontes*, 2017 IL App (1st) 142085, ¶ 52 (quoting *People v. Jones*, 184 Ill. App. 3d 412, 429 (1989)); see also 720 ILCS 5/4-4 (West 2016) ("A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct ***, when his conscious objective or purpose is to accomplish that result or engage in that conduct."). The nature and extent of a victim's injuries may also indicate the defendant's intent to kill (*People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 59), and a presumption of intent to kill may be inferred where one voluntarily and willfully commits an act that has a natural tendency to destroy another person's life (*People v. Petermon*, 2014 IL App (1st) 113536, ¶ 39). "It falls to the trier of fact to determine if the requisite intent to kill existed, and that determination will not be disturbed on appeal unless there is a reasonable doubt as to [the] defendant's guilt." *Id.*

¶ 42    Here, the circumstantial evidence, taken in the light most favorable to the State, was sufficient for a rational trier of fact to find that defendant had the specific intent to commit murder

when Munoz, the mother of defendant's children, drove Portillo to the park. There, defendant and Lopez struck Portillo repeatedly on the body and head with baseball bats, including while he was facedown on the ground.

¶ 43    Defendant admitted to Klein that he wanted to meet with Portillo, who was not getting the "message" to leave Munoz alone, and that he struck Portillo at least three times with a baseball bat. Neal testified that defendant stated he left Portillo "leaking." When Steinmetz arrived at the park, he was unsure whether Portillo was alive, as Portillo was covered in a "large amount" of blood and had multiple "gashes" to the back of the head. The injuries to Portillo's head are detailed in photographs, which depict his head in a pool of blood, blood and stitches to the head, and blood pooled in an ear.

¶ 44    Additionally, Dr. Rosenblatt testified that Portillo had tissue swelling around the left ear, and fractures to the left temporal bone, posterior fossa, and posterior wall of the left sphenoid sinus. At trial, Portillo testified that his injuries required five days' hospitalization. He showed a scar on the left side of his head and stated he was now partially deaf in his left ear.

¶ 45    Based on the "nature of the attack," where defendant repeatedly struck Portillo with a baseball bat while he was on the ground, and the "significance of the injuries inflicted," particularly to Portillo's head, a trier of fact could conclude that defendant had the specific intent to kill Portillo. See *Viramontes*, 2017 IL App (1st) 142085, ¶ 66. As we have stated, "a solid length of wood when used as a bludgeon and swung against the head both violently and repeatedly is *** capable of taking human life." *People v. Maxwell*, 130 Ill. App. 3d 212, 216 (1985); see also *People v. Whitt*, 140 Ill. App. 3d 42, 49 (1986) ("[t]he manner in which the bat was used in this case made it a deadly weapon capable of taking human life").

¶ 46 We further reject defendant's contention that he lacked the specific intent to kill since no evidence showed that he threatened to kill Portillo and he actually stated that he did not intend to kill Portillo. While accompanying threats can support proof of the specific intent to kill, the absence of such threats does not disprove the specific intent to kill or negate other evidence presented at trial. See *People v. Pearson*, 2018 IL App (1st) 142819, ¶ 33 ("The State need not show that defendant expressed an intent to kill; rather, intent can be shown by evidence of the surrounding circumstances and the character of the assault."). Here, where defendant and Lopez went to the park armed with bats to meet Portillo, whom defendant believed raped defendant's fiancée and did not get the "message" to leave her alone, we cannot say that the evidence was so improbable or unsatisfactory that no rational trier of fact could have found that defendant had the requisite intent to kill. See *Petermon*, 2014 IL App (1st) 113536, ¶ 39. We therefore affirm defendant's conviction for attempted murder.

¶ 47 Defendant next contends that he was not proven guilty of armed robbery beyond a reasonable doubt when insufficient evidence established that he actually took Portillo's property. He notes that in his statement to the police he admitted that he was armed with a bat, denied taking Portillo's phone, and asserted that the beating was motivated by Portillo's actions towards defendant's fiancée.

¶ 48 To sustain a conviction for armed robbery as charged, the State had to prove beyond a reasonable doubt that defendant knowingly took a cellphone and cannabis from Portillo while armed with a bat. 720 ILCS 5/18-2(a)(1) (West 2016). "It is well established that the elements of armed robbery may be proved by circumstantial evidence." *People v. Harris*, 2012 IL App (1st)

100678, ¶ 84. However, that circumstantial evidence must be of "a conclusive nature and produce a reasonable and moral certainty that the offense charged was actually committed." *Id.*

¶ 49   Here, a rational trier of fact could find that defendant planned and completed the armed robbery. At trial, Portillo testified that when he went to the park with Munoz on August 21, 2017, he had a phone, marijuana, identification, and change in his pocket. When he arrived at the hospital following the attack, his phone and marijuana were gone. Neal testified that between 7 and 7:30 p.m. that night, Neal and Lopez discussed "robbing someone for weed" and that Munoz would call the intended target. Neal acknowledged that no one told him there would be a fight or a robbery; rather he thought defendant and Lopez would "get weed from this guy." Neal further testified that although he did not go to the park with defendant, Munoz, and Lopez, he later saw Lopez with a phone in Lopez's garage. Lopez stated that it was "the guy's phone that they took."

¶ 50   While the trial court acknowledged that Neal's credibility was affected by his admission that he told the police several different versions of events and that he was also charged in this case, the court found his testimony that defendant, Lopez, and Munoz planned to take marijuana from a man and that Lopez later possessed a phone taken from the "guy" to be credible. See *People v. Sullivan*, 366 Ill. App. 3d 770, 782 (2006) (the trier of fact may "accept or reject as much or as little of a witness's testimony as it pleases"). Moreover, Neal's testimony that Munoz's role was to call the person with the "weed" was corroborated by Portillo's testimony that Munoz wanted to smoke marijuana with him.

¶ 51   To the extent that defendant argues that no proceeds from the robbery were recovered, he points to no requirement that robbery proceeds be recovered in order to sustain a conviction. See, *e.g.*, *People v. Hughes*, 259 Ill. App. 3d 172, 178 (1994) (affirming the defendant's armed robbery

conviction even though neither a firearm nor robbery proceeds were found on his person less than 20 minutes after the crime). Moreover, Neal testified that he observed Lopez with a phone that Lopez identified as taken from the "guy," and the trial court found that Neal's testimony that Lopez had a Samsung phone in Lopez's garage to be credible. When weighing evidence, the trier of fact is not required to disregard inferences flowing naturally from the evidence before it or search out all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60.

¶ 52    Accordingly, viewing the evidence in the light most favorable to the State, we cannot say that no rational trier of fact could have concluded that the evidence established that defendant and Lopez conspired to beat Portillo and take his marijuana, and that Portillo's phone and marijuana were taken during the beating. We reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains (*Newton*, 2018 IL 122958, ¶ 24); this is not one of those cases. Defendant's conviction for armed robbery is therefore affirmed.

¶ 53    For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.