THIRD DIVISION

June 28, 2000

Nos. 1-98-0382 and 
1-98-1588, Consolidated

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

GREYLON BRIALS and  KWAME McGLASTON,

Defendants-Appellants.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County.

No. 96 CR 15156

The Honorable

James M. Schreier,

Judge Presiding.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:

Defendants Kwame McGlaston and Greylon Brials were indicted for the aggravated criminal sexual assault and unlawful restraint of 11-year-old C.B.  They were tried simultaneously, McGlaston in a bench trial and Brials before a jury.  Brials was convicted of two counts of aggravated criminal sexual assault and one count of unlawful restraint and sentenced to two consecutive six-year prison terms.  McGlaston was convicted of three counts of aggravated criminal sexual assault and one count of unlawful restraint and sentenced to an eight-year prison term.  We affirm the convictions but remand for resentencing.

Brials appeals the following issues: (1) whether his confession should have been suppressed because his continued detention was unlawful after probable cause had dissipated; (2) whether his sentences should be concurrent because they were not committed as part of a single course of conduct; and (3) whether one of his sentences should be vacated because the trial court sentenced him twice on one charge.

In addition, Brials argues that 
the jury was improperly instructed that an 11-year-old could not consent, while McGlaston argues that the State did not prove beyond a reasonable doubt that C.B. could not give knowing consent.  They both argue that their
 convictions for aggravated criminal sexual assault, based on commission during the felony of unlawful restraint, must be reduced to criminal sexual assault because unlawful restraint is a lesser-included offense of criminal sexual assault and cannot be used as an aggravating factor.

McGlaston also claims his right to a jury trial was violated where the trial court failed to obtain a knowing waiver in open court.

BACKGROUND

Suppression Hearing

At the hearing on Brials' motion to suppress, Detective Duckhorn testified that C.B. told officers that three men assaulted her.  She did not give the men's names.  She described the second man as a black man with a dark complexion, about 20 years old, 5 feet 8 inches tall and weighing 160 pounds.  She also identified McGlaston's house and described the interior where the assaults occurred.  

McGlaston told detectives that he was in the backyard with two friends when C.B. walked by.  He asked her to come inside the house to smoke marijuana and have sex.  Inside the house, C.B. refused to have sex with McGlaston, but went upstairs with his friend Emanuel.  Brials also went upstairs after buying a condom from McGlaston.  When Brials came downstairs, he said he had had sex with C.B. and would return later.  McGlaston went upstairs to have sex with C.B., but she refused again.  He invited her to spend the night, but she left the house and he did not see her again.  C.B. identified McGlaston in a lineup.

McGlaston described Brials to the detectives as 17 or 18 years old, 5 feet 10 inches tall, with a medium to dark complexion.

When Detective Duckhorn first questioned Brials, he admitted that he was at the house with McGlaston and C.B., selling drugs in the backyard.  Brials said that C.B. had walked by and then went inside the house with McGlaston.  Brials said that some time later he saw McGlaston and C.B. inside the house when he went in to use the telephone.

Duckhorn questioned Brials a second time in the presence of Assistant State's Attorney Oppenheimer.  Brials was confronted with information from McGlaston's statement and then made another statement, admitting that he had sexual contact with C.B.

Brials testified that on May 24, 1996, he was taken into custody because McGlaston had implicated him in the assault of a girl.  The police told him that McGlaston's version of what happened differed from his.  He admitted knowing McGlaston but denied that they were friends.

Brials' motion to suppress his statement was denied.

Trial

 At trial C.B. testified that on May 22, 1996, she returned home from school at about 3 p.m.  About 4 p.m. she left with two of her foster sisters to go to a playground.  At the baseball field C.B. met a friend and went home with her to skip rope.  It was still somewhat light out when she went to her friend's house.  A short time later she went back to the baseball field and headed home.

At the corner of 121st Street and Yale Avenue, some men in McGlaston's backyard called to her.  She had seen McGlaston before in the neighborhood but did not know his name at the time.  She did know the names of Emanuel and Tiger, who were also in the yard.  She went over to the yard, and McGlaston asked her to come to his house, but she refused.  He grabbed her by the arm, told her to "come on," and pulled her onto the back porch and into the kitchen.  She did not cry out when McGlaston grabbed her.

Inside the house C.B. saw a large brown dog with a lot of hair, and in the bedroom near the kitchen she saw a photograph of McGlaston and his sister on top of a television set.  McGlaston told her to come upstairs.  She said she didn't want to go, but he grabbed her arm and took her to the attic.  She saw clothing, a mattress with a pillow and sheet and toys strewn about the room.

McGlaston forced her to lie on the mattress and took off all her clothes except her socks.  McGlaston then took his pants off and put his penis in her vagina.  She tried to scream but he covered her mouth with one hand and held her arm down with the other.  He told her he would kill her if she said anything.

McGlaston went downstairs and another man came upstairs.  C.B. did not move from the mattress because she was in shock.  The second man also held her down and put his penis in her vagina and then threatened to kill her.  She recognized his voice as that of one of the men she had seen downstairs, but could not remember his name.

After the second man left, Emanuel came upstairs.  He held her down, threatened her, and put his penis in her mouth and her vagina.  She knew his name because he lived across the street from her.

C.B. testified that each of the three men returned and assaulted her again.  At one point all three were in the attic, and she heard McGlaston say that his mother was not home.  After the men left she looked out the attic window and saw the second offender in the yard near the alley.  He was giving something to a woman in exchange for money.  C.B. left the attic in the morning.  As she left the house, she saw McGlaston sleeping.  She went to the park and stayed there until about 8 p.m. on May 23.  She was very upset and finally went home and told her mother and grandmother about the assaults.

At the hospital, C.B. told the doctor she had been raped by three men, but did not tell him that one had put his penis in her mouth.  She told police that she got into a blue four-door car with three black men at 125th Street and Michigan Avenue because they said they would give her a ride home.  C.B. testified that she lied about the car because she thought that she would be blamed for walking over to McGlaston's yard.

C.B. identified McGlaston in a lineup.  She saw a second lineup in which she recognized Brials, but did not point him out because she was afraid.  She later told her foster grandmother, Bessie Robinson, that Brials was in the lineup.  A few days later she spoke to an assistant State's Attorney and told him that she did not identify the second man who had raped her because she was afraid he would kill her.

C.B.'s foster mother, Laura Alston, testified that C.B. was a sixth-grader in special education classes.  Alston called the police on the night of May 22, 1996, when C.B. did not return home.  She told police that C.B. had run away four other times and that, before C.B. left for the park, they had an argument about personal hygiene.

Bessie Robinson testified that C.B. returned home on May 23, 1996, between 8 and 8:30 p.m.  She appeared frightened and dazed.  Her demeanor was unusual and her answers were not coherent when Robinson questioned her.  C.B. gave her the names Kwame and Emanuel and said the men had threatened to kill her. C.B. cried and appeared ashamed.  Neither Robinson nor Alston noticed blood on C.B.'s clothing when she came home.

Both Alston and Robinson testified that C.B. was nervous during the second lineup.  After they arrived home C.B. told them that one of the offenders was in the lineup but she did not identify him because she was afraid he would kill her.

Dr. Scott Cooper testified that he examined C.B. about 11:30 p.m. on May 23, 1996.  C.B. told him she had been raped vaginally by three men but that there had been no oral or anal contact.  Dr. Cooper's examination did not show any external tears or lacerations in the vaginal area, but the area was tender and painful.  He could not perform an internal examination with a speculum because C.B. was so young and in too much pain.

Outside the presence of Brials' jury, Officer Latham testified for the State in the case against McGlaston.  Latham testified that, when he first spoke with McGlaston, McGlaston said that he did not rape C.B. but that she had consented to sex.  McGlaston said that he, Brials, Emanuel and Tiger had vaginal sex with C.B.  Latham further testified that C.B. never told him that McGlaston threatened to kill her.

Detective Duckhorn's testimony at trial was similar to that at Brials' suppression hearing.

Assistant State's Attorney Michael Oppenheimer testified that Brials told him that he was in the backyard when C.B. walked by the house.  Brials said C.B. looked young and "retarded."  Brials then admitted that Emanuel went to the attic where C.B. was at 11:14 p.m.  He knew what time it was because he looked at the clock on the microwave.  After Emanuel came downstairs, Brials went to the attic and had oral sex with C.B.  He then went outside and stayed in the yard until 1 a.m. 

Assistant State's Attorney Fabio Valentini testified that he met with C.B. on May 28, 1996.  C.B. told him that she recognized one of the offenders in the second lineup, but she did not identify him because he had threatened to kill her.  The offender had been the person second from the right in the lineup.  Detective Duckhorn later told Valentini that Brials was the person second from the right in the lineup.  C.B. also admitted to him that she had not been picked up in a car but had walked to the gate herself.  She said she lied because she was afraid to get in trouble.  She also named "Manuel" and Tiger as participants.

Vernetta McGlaston, defendant McGlaston's mother, testified for both defendants.  She was a special education teacher and C.B. was one of her students.  She testified that her daughter Felicia brought her children to her house every day about 6 a.m. so Mrs. McGlaston could take them to school.  Mrs. McGlaston also brought them home from school and kept them until Felicia picked them up at 5:30 p.m.  The children used the attic to play and do homework.

On May 22, 1996, Mrs. McGlaston left for work about 8:20 a.m. and returned at 3 p.m.  McGlaston was home at that time.  She left again at 10:30 p.m. for a date and did not return until about 3 a.m. on May 23, 1996.  She saw McGlaston when she came home, but she saw no one else.  On the morning of May 23, Felicia brought the children at 6 a.m.  Mrs. McGlaston never saw C.B. in her home or yard that morning, but she did not go into the attic.

Felicia McGlaston testified that when she brought her children to her mother's house on May 23, they went to the attic to play.  She did not see her brother or anyone else in the house.

Brials testified that on the evening of May 22, 1996, he saw C.B. walking down the street.  Two of the men in the yard called her over and she spoke with McGlaston through the gate.  Emanuel told Brials that C.B. was in grammar school.  She came into the yard and sat on the steps into the kitchen.  He saw her enter the house, but he never saw anyone grab her to take her inside.  About an hour later he went inside to use the telephone and saw C.B. and McGlaston in the kitchen.  Brials testified that he went back outside and stayed in the yard with Emanuel, selling drugs until 1 a.m., when he left.  He saw C.B. leave the house.  He denied being in the attic or having sex with C.B. that night.

ANALYSIS

Brials' Motion to Suppress

Brials argues that, although police had probable cause to arrest him, probable cause dissipated after C.B. failed to identify him in a lineup.  Brials cites 
People v. Quarles
, 88 Ill. App. 3d 340 (1980), to support the argument that his statement, given after the lineup, was a fruit of his unlawful continued detention.  

The evidence presented at the hearing on the motion to suppress showed that C.B. had described three offenders and the house in which the assaults occurred.  Kwame McGlaston had given a statement inculpating himself and Brials, and a search of the house corroborated details from C.B.'s account.  C.B.'s description of one of the offenders matched the description of Brials.  Finally, in his first statement Brials admitted being at the scene and seeing C.B. with McGlaston, but denied assaulting C.B.  In denying the motion to suppress, the trial court found:

"I believe the arrest at his home was done with more than minimal probable cause, substantial probable cause assuming there was dissipation of that quantum after the victim did not identify the defendant at a lineup, and even going further to say if some reviewing court would conclude that the dissipation obviated the probable cause, 
which I don't say
, but assuming that possibly to be the case, holding the defendant at the police station for a brief period of time detaining him was absolutely a minimal intrusion upon his person and I think it reasonable for police to advise him of his rights, conduct an interview to finally clarify the whole situation ***."  (Emphasis added.)

Quarles
 is distinguishable from this case.  There, the police arrested the defendant and then discovered that there was no substance to the charges.  A detective then questioned the defendant about an unrelated burglary, to which the defendant confessed.  The court held that the confession must be suppressed because the defendant was illegally held in custody on a charge the police knew had no merit.  But here, C.B.'s failure to identify Brials in the lineup did not negate the substantial evidence supporting probable cause.  In finding no dissipation, the trial court noted, "With a young girl of a tender age, perhaps around eleven, sometimes young ladies like that, young girls like that can be embarrassed, could be afraid to get involved, could be afraid to point a finger and pursue this kind of a case of a sexual assault case."  We agree that because Brials put himself at the scene, was implicated in the assaults by his codefendant, and matched C.B.'s description of the second offender, there was no dissipation of probable cause by C.B.'s failure to identify Brials in the lineup.  The trial court did not err in denying the motion to suppress.

Brials: Consecutive Sentences

Brials argues that the trial court erred in imposing consecutive sentences for the two separate acts of aggravated criminal sexual assault.  He claims that the acts were not committed as part of a single course of conduct with no substantial change in the criminal objective and that, even if they were, the trial court made no finding of a single course of conduct.

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."   134 Ill. 2d R. 615(a).  Sentencing issues are excepted from the doctrine of waiver when they affect a defendant's substantial rights.  
People v. McCleary
, 278 Ill. App. 3d 498, 501-02 (1996).

Section 5-8-4 of the Unified Code of Corrections (730 ILCS 5/5-8-4 (West 1996)) "plainly requires the imposition of consecutive sentences only when the subject offenses are committed in a single course of conduct" (
People v. Bole
, 155 Ill. 2d 188, 198 (1993)).  The statute has since been amended to require consecutive sentences regardless of whether the offenses were committed in a single course of conduct.  730 ILCS 5/5-8-4(b) (West 1998).  The effective date of the amendment was July 22, 1997, after the offenses in this case were committed but before defendant was sentenced.  The State has not raised the issue of whether the amendment applies to the defendant in this case, so we will apply the law as it existed before the amendment.

The State argues that Brials committed the two acts of aggravated criminal sexual assault as part of a single course of conduct in which there was no substantial change in the criminal objective.  A single "'course of conduct' *** could include a range of activity and *** is not necessarily confined to a single incident."  
Bole
, 155 Ill. 2d at 193.  "[T]he trial court is presumed to know the law and apply it properly."  
People v. Howery
, 178 Ill. 2d 1, 32 (1997).

The evidence showed that Brials assaulted C.B. twice between late evening on May 22, 1996, and early morning of May 23, 1996.  Although Brials went outside after the first assault to sell drugs in the backyard, he returned to the attic and assaulted C.B. again.  C.B. remained in the same location between assaults, the assaults occurred within a time span of several hours, and Brials committed the same offense each time.  The evidence shows no change in Brials' criminal objective.  The trial court's finding that consecutive sentences were mandatory is supported by the evidence.

Brials: Sentencing Twice on One Charge

Brials next argues that the mittimus shows he was sentenced twice on the same charge, count XIII, in violation of due process.  The record shows that Brials was charged with three counts of aggravated criminal sexual assault, counts V, IX and XIII.  Count V was based on the use of force or threat of force, count IX on the knowledge that C.B. was unable to understand the nature of the act, and count XIII on the knowledge that C.B. was unable to give knowing consent.   The evidence at trial showed that Brials had two separate encounters with C.B., and the jury received and returned one verdict form for each encounter.  They read: "We, the jury, find the defendant, Greylon Brials, guilty of aggravated criminal sexual assault, Greylon Brials' penis to [C.B.'s] vagina, first incident," and "We, the jury, find the defendant, Greylon Brials, guilty of aggravated criminal sexual assault, Greylon Brials' penis to [C.B.'s] vagina, second incident." The jury found him guilty of each act and the trial court clearly sentenced Brials for two counts of aggravated criminal sexual assault. 

"[W]here an indictment contains several counts arising out of a single transaction, and a general verdict is returned, the effect is that the defendant is guilty as charged in each count, and if the punishment imposed is one which is authorized to be inflicted for the offense charged in any one or more of the counts, the verdict must be sustained."  
People v. Lymore
, 25 Ill. 2d 305, 308 (1962).

Here, the verdict forms were general and did not refer to the distinctions between counts V, IX and XIII of the indictment.  "[A] court must carefully examine the nature of the particular defendant's conduct as shown by the evidentiary record and then determine whether that conduct can be broken down into separate parts, 
i.e.
, distinct and identifiable 'overt or outward manifestations,' that would, by themselves, support multiple convictions."  
People v. Bowens
, 307 Ill. App. 3d 484, 489 (1999), quoting 
People v. King
, 66 Ill. 2d 551, 566 (1977).  In 
People v. Partee
, 157 Ill. App. 3d 231, 270 (1987), the court found that the defendant's several blows to different parts of the victim's body were multiple acts sufficient to support convictions on three counts of aggravated battery.
  In this case, Brials assaulted C.B., went downstairs for a period of time, and then returned and assaulted C.B. again.  Each of the two acts was sufficient to support any of the three counts of aggravated criminal sexual assault charged in the indictment.

 Although the mittimus refers only to count XIII, the trial judge never referred specifically to count XIII in sentencing Brials.  We direct the trial court to correct the mittimus to specify the particular two counts of the indictment under which Brials was sentenced.  See 
People v. Maldonado
, 224 Ill. App. 3d 913, 918 (1992).

Consent

Brials argues that the trial court erred in instructing the jury that an 11-year-old could not consent to an act of sexual penetration.  In a related argument, McGlaston claims that the State failed to prove that C.B. could not understand the nature of the act or give knowing consent.

The State correctly notes that the trial court only entered judgment against McGlaston on count IV, which was based on the use of force or threat of force.  Counts VIII and XII were based on McGlaston's knowledge that C.B. was unable to understand the nature of the act and unable to give knowing consent.  Because McGlaston was not sentenced on these charges, his argument is moot.  However, we still must address this issue with regard to Brials.

The standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Collins
, 106 Ill. 2d 237, 261 (1985); 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).  "[I]t is the totality of the record which must be examined with special caution when clandestine sexual acts are charged."  
People v. Myles
, 31 Ill. App. 3d 45, 48 (1975).

The dissent argues that giving the instruction that an 11-year-old cannot consent to an act of sexual penetration was "a grave and fundamental error."  Slip op. at 21.  We disagree.  "'Even though error may have been committed in giving or refusing instructions it will not always justify reversal when the evidence of defendant's guilt is so clear and convincing that the jury could not reasonably have found him not guilty.'"  
People v. Truelook
, 35 Ill. 2d 189, 192 (1966), quoting 
People v. Ward
, 32 Ill. 2d 253, 256 (1965).  We need not decide whether the trial court erred in instructing the jury that an 11-year-old can never consent to an act of sexual penetration.  Here, the evidence of Brials' guilt was clear and convincing, so that if the trial court erred in giving the instruction, the error was harmless.  

"Knowing consent requires us to examine all of the circumstances to see if defendant knowingly exercised such control over complainant that a trier of fact could find that complainant did not submit to the sexual advances of defendant voluntarily, intelligently, and by an active concurrence."  
People v. Whitten
, 269 Ill. App. 3d 1037, 1044 (1995).  In 
Whitten
, the defendant was convicted of criminal sexual assault of the victim, who was a 32-year-old developmentally disabled woman with an IQ of 54 and a functional level of 9 years and 9 months.  She did not protest, cry out or physically resist the defendant, who was a staff member at her residential facility.  The defendant argued on appeal that the State failed to prove that the victim was unable to give knowing consent.

The court disagreed, finding that the "circumstances indicate that defendant knew, intended, and had the capability to take sexual advantage of one who was unable to give knowing consent because of the disparity not only in IQs but also in defendant's ability to use his position of power and authority over complainant."  
Whitten
, 269 Ill. App. 3d at 1044. 

The evidence in this case showed that McGlaston was 21 and Brials was 17 at the time of the offenses.  C.B. was 11, and the record reveals that she was learning disabled.  See 
People v. Strait
, 116 Ill. App. 3d 110, 113 (1983); 
People v. Riley
, 84 Ill. App. 2d 296 (1967) (a seven-year-

old is conclusively presumed to be unable to legally consent to a sexual act).  C.B. resisted going into the house and attic and testified that, when she tried to scream, McGlaston covered her mouth with his hand and held her down on the mattress.  All three offenders threatened to kill her.  A victim's failure to cry out or resist does not establish consent in sex cases if the victim is threatened or in fear of being harmed.  
People v. Stengel
, 211 Ill. App. 3d 337 (1991).  "If circumstances show resistance to be futile or life-endangering or if the victim is overcome by superior strength or fear, useless or foolhardy acts of resistance are not required."    
In re C.K.M.
, 135 Ill. App. 3d 145, 151 (1985).

An 11-year-old girl, outnumbered by three men in their late teens or early 20s who threatened to kill her if she resisted, did not "submit to the sexual advances of defendant[s] voluntarily, intelligently, and by an active concurrence."  
Whitten
, 269 Ill. App. 3d at 1044.  The State proved beyond a reasonable doubt that defendants took sexual advantage of C.B., who was unable to give knowing consent because of the disparity in age, mental ability and physical size and strength.

The dissent cites 
People v. Mueller
, 54 Ill. 2d 189 (1973), and 
People v. Trinkle
, 68 Ill. 2d 198 (1977), both of which we find distinguishable from the case before us.  Slip op. at 21.  In 
Mueller
, the supreme court reversed a conviction for deviate sexual assault upon a seven-year-old for lack of proof of force or threat of force.  The offense at issue here is aggravated criminal sexual assault based upon the inability of the victim to give knowing consent.  Force or threat of force is not an element.  We do not find 
Mueller
 applicable.  See 
Strait
, 116 Ill. App. 3d at 113, citing 
Riley
, 84 Ill. App. 2d at 300.

In 
Trinkle
, both the indictment and the jury instructions stated that defendant could be guilty of attempted murder without a specific intent to kill.  The court held that "specific intent is an indispensable element to this crime, and hence the indictment and instructions relating to this crime were fatally erroneous."  
Trinkle
, 68 Ill. 2d at 199.  The court noted that there was no evidence, direct or circumstantial, that the defendant had a specific intent to kill.  Here, despite the instruction, the record reveals substantial evidence from which a rational trier of fact could have found beyond a reasonable doubt the element of lack of knowing consent. 

Unlawful Restraint as Aggravating Factor

Both defendants argue that their aggravated criminal sexual assault convictions must be reduced to criminal sexual assault because the aggravated criminal sexual assault charges were based on the commission of criminal sexual assault during the felony of unlawful restraint.  They argue that unlawful restraint is a lesser-included offense of criminal sexual assault (
People v. Allman
, 180 Ill. App. 3d 396 (1989)) and cannot be used to enhance criminal sexual assault to aggravated criminal sexual assault (
People v. Haron
, 85 Ill. 2d 261 (1981) (holding that factors inherent in an underlying offense cannot be used to enhance that offense)).

A person commits unlawful restraint when he "knowingly without legal authority detains another."  720 ILCS 5/10-3 (West 1996).  "The gist of unlawful restraint is the detention of a person by some conduct which prevents him from moving from one place to another."   
People v. Bowen
, 241 Ill. App. 3d 608, 627-28 (1993).   Here, C.B. testified that each defendant held her down during the assaults and threatened to kill her.  McGlaston was specifically convicted and sentenced on count IV, aggravated criminal sexual assault by use of force or threat of force.  "[A] criminal sexual abuse by the use of force or threat of force will generally first involve a physical restraint of the victim."  
People v. Yeast
, 236 Ill. App. 3d 84, 89 (1992).   As in 
Bowen
, "the specific instance of conduct to which the charge was directed was the act of detention occurring during the criminal sexual assaults."  
Bowen
, 241 Ill. App. 3d at 627.  Under these facts, unlawful restraint is a factor inherent in the offense of criminal sexual assault.  

"Double enhancement occurs when a factor already used to enhance an offense or penalty is reused to subject a defendant to a further enhanced offense or penalty."  
People v. Thomas
, 171 Ill. 2d 207, 223 (1996).   Here, the offense of criminal sexual assault was enhanced to aggravated criminal sexual assault based on its commission during the felony of unlawful restraint.  Because unlawful restraint is already a factor inherent in the offense of criminal sexual assault, it cannot be used a second time as an aggravating factor.  The trial court properly vacated defendants' convictions for unlawful restraint as a lesser included offense (see 
People v. Conerty
, 296 Ill. App. 3d 459 (1998)).  However, based on 
Haron
, 85 Ill. 2d 261, we must also reduce defendants' convictions for aggravated criminal sexual assault to the lesser offense of criminal sexual assault and remand this case to the trial court for resentencing on the reduced charges. 

McGlaston's Jury Waiver

McGlaston argues that his conviction must be reversed and remanded for a new trial because the record does not contain a signed jury waiver (though the September 23, 1997, half-

sheet entry says that a jury waiver was signed) and the transcript of the proceedings for that day does not contain a reference to a jury waiver.

The report of proceedings on January 22, 1997, shows that defendant McGlaston was present when his attorney, Mr. Vargas, told the court, "And I have spoken to my client regarding whether he wanted a jury or bench.  And it [is] his indication even though we haven't signed the jury waiver form that he's anticipating a bench trial."  The parties then scheduled trial for March 18, 1997.  In anticipation of trial, the following colloquy occurred between Brials' attorney, Mr. Willis, McGlaston's attorney, Mr. Vargas, and the court:

"MR. WILLIS: Judge, could you put on the–indicate on the mittimus civilian clothes on the 18th?

THE COURT: Oh, yes.  Civilian clothes.

MR. WILLIS: Thank you, Judge.

MR. VARGAS:  Your Honor, even though we have indicated a bench, maybe I should do the same thing.

THE COURT:  He can get civilian clothes.  That's fine with me.  Always change his mind and want a jury and we'll have it."

However, trial was postponed until September 23, 1997.  The half-sheet for that date indicates that McGlaston signed a jury waiver, though no signed jury waiver is in the record on appeal.

The State argues that defendant waived this issue because he failed to raise it in his written posttrial motion.  Though both an objection at trial and a written posttrial motion are required to preserve an issue for review (
People v. Williams
, 165 Ill. 2d 51, 60 (1995)), we may review plain errors affecting substantial rights under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) even if those errors were not brought before the trial court.  We will address the merits of defendant's claim.

Under section 103-6 of the Code of Criminal Procedure of 1963 (Code), a bench trial may be held if the right to trial by jury is "understandingly waived by defendant in open court."  725 ILCS 5/103-6 (West 1998).  Section 115-1 of the Code provides: "All prosecutions except on a plea of guilty or guilty but mentally ill shall be tried by the court and a jury unless the defendant waives a jury trial in writing."  725 ILCS 5/115-1 (West 1998).  But failure to file a written jury waiver does not require reversal "so long as the defendant's waiver was made understandingly in accordance with section 103-6 of the Code of Criminal Procedure."  
People v. Tooles
, 177 Ill. 2d 462, 468 (1997).  Whether a jury waiver was made understandingly turns on the facts and circumstances of each particular case.  
People v. Tye
, 141 Ill. 2d 1, 24 (1990).  An accused typically speaks and acts through his attorney, and a jury waiver is valid when "made by defense counsel in defendant's presence where defendant gave no indication of any objection to the court hearing the case."  
People v. Frey
, 103 Ill. 2d 327, 332 (1984).  "We have never found a valid jury waiver where the defendant was not present in open court when a jury waiver, written or otherwise, was at least discussed."  
People v. Scott
, 186 Ill. 2d 283, 285 (1999).  The supreme court found the facts in 
Scott
 distinguishable from those in 
Frey
 because, unlike 
Frey
, the defendant was never present in open court when a jury waiver was discussed.  
Scott
, 186 Ill. 2d at 285.  The 
Scott
 court also noted that the references to proceeding with a bench trial "arose in a dialogue between defendant's attorney and the trial judge concerning a motion to dismiss. *** [T]he statement was not meant as an affirmative waiver, but instead as an indication to the court that defendant would proceed with trial despite the pending motion."  
Scott
, 186 Ill. 2d at 286.  The written jury waiver in 
Scott
 contained a deadline after which the waiver was irrevocable.  The court was unwilling to presume that defendant's silence was an acquiescence, but that it "may have been due to his belief that it was too late to revoke his jury waiver."

But in 
People v. Asselborn
, 278 Ill. App. 3d 960, 962 (1996): 

"[T]he colloquy between defense counsel and the trial court occurred prior to the onset of opening statements by counsel.  Defendant was present during the colloquy and failed to object.  A defendant who permits his counsel in his presence and without objection to waive his right to a jury trial is deemed to have acquiesced in, and is bound by, his counsel's actions."

In this case, though the record on appeal does not contain a written jury waiver, the half-

sheet does show that McGlaston waived a jury.  As in 
Frey
 and 
Asselborn
, McGlaston was also present when his attorney told the court that McGlaston waived his right to a jury, but had not yet signed a written waiver.  We note that McGlaston does not contend in his brief that he failed to knowingly waive his right to a jury trial, but only that the record is insufficient to show that he did so.  We disagree.  

McGlaston was present in court when his attorney told the trial judge that he wanted a bench trial.  His bench trial was conducted simultaneously with Brials' jury trial.  McGlaston cannot fairly argue that he did not know that he also had the right to a jury trial.  The dissent (slip op. at 22) cites 
People v. Williamson
, 311 Ill. App. 3d 54, 60 (1999), noting that, as in this case, no written waiver was in the record, though the defense attorney did indicate there would be a bench trial.  But in 
Williamson
, 311 Ill. App. 3d at 60, we noted that on "the only two dates when we know that defendant was in open court neither defendant nor his attorney made any statement regarding jury waiver or proceeding by bench trial," and found these circumstances distinguishable from 
People v. Frey
, 103 Ill. 2d at 333, where the defendant was in court before trial "when the jury waiver was discussed."  The facts of this case more accurately reflect those in 
Frey
 than those in 
Williamson
.  We find the record reflects that McGlaston knowingly waived his right to a jury trial.

The judgments of the circuit court are affirmed.  We remand for resentencing of both defendants and correction of defendant Brials' mittimus.

Affirmed and remanded; mittimus corrected.

CERDA, J., concurs.

WOLFSON, J., dissents.

JUSTICE WOLFSON, dissenting:

I respectfully dissent from the decision to affirm the convictions of both defendants.

Greylon Brials

Brials was convicted of Aggravated Criminal Sexual Assault.  It is a crime of force and violence.  
People v. Mueller
, 54 Ill. 2d 189 (1973).  Age of the victim was not an issue.  Consent was.  A fact issue.  The trial judge took the issue away from the jury when he instructed that an 11-year-old cannot consent to any act of sexual penetration.  The instruction does not appear in the Illinois Pattern Jury Instructions for a good reason--it doesn't belong there.  The instruction was a grave and fundamental error.  We should reverse and remand without evaluating the evidence when the jury has not been correctly instructed on an essential element of the case.  See 
People v. Trinkle
, 68 Ill. 2d 198 (1977).

Kwame McGlaston

Whether a defendant has validly waived a jury trial poses a question concerning a substantial right.  
People v. Stokes
, 281 Ill. App. 3d 972, 976 (1996).  A defendant validly waives his right to a jury trial only if he does so "(1) understandingly; and (2) in open court."  
People v. Scott
, 186 Ill. 2d 283, 285 (1999); 725 ILCS 5/103-6 (West 1992).

There was no valid jury waiver here.  Vague references to anticipation of a "bench" trial eight months before trial do not even come close to a valid waiver, especially where there is no 

signed jury waiver in the record.

In 
Scott
, on the day of trial, in the defendant's presence, defense counsel said: "And we would proceed to the 
bench
 trial today."  The judge replied: "Okay, we'll proceed to 
bench
 trial, 

then?"  And he said: "We will then proceed with the 
bench
 trial."  (Emphasis added.)  
Scott
, 186 Ill. 2d at 284.  The defendant was not asked for his preference.  In 
Scott
, despite the presence of a signed jury waiver, the court held the defendant did not validly waive his right to a jury trial in open court.  The conviction was reversed and the cause remanded.

Recently, in 
People v. Williamson
, 311 Ill. App. 3d 54 (1999), we reversed a murder conviction because the defendant did not understandingly waive his right to a jury trial in open 

court.  There, as here, no written waiver was in the record.  There, as here, before the day of trial the defense lawyer indicated there would be a bench trial.  In fact, he said it three different times.  Each time, the defendant was not asked any question by the trial court.

We have not hesitated to reverse convictions where trial judges fail to take the few minutes necessary to obtain a knowing jury trial waiver from the defendant.  See 
People v. Taylor
, 291 Ill. App. 3d 18 (1997); 
People v. Eyen
, 291 Ill. App. 3d 38 (1997); and 
People v. Roberts
, 263 Ill. App. 3d 348 (1994).  It is not a difficult thing to do and it should not require the constant reminders that have come from the appellate and supreme courts of this state.  See 
People v. Chitwood
, 67 Ill. 2d 443, 448-49 (1977), and cases cited in 
Williamson
. 

The right to a jury trial is not a technicality.  It is at the core of our system of law.  It does not depend on the character of the accused or the nature of the crime he may have committed.  Today, we trivialize that right.