2022 IL App (2d) 200393-U
No. 2-20-0393
Order entered April 29, 2022

NOTICE: This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).
_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-CF-1084 |
| | ) | |
| ROBERT EUGENE GUERRERO, | ) | Honorable |
| | ) | Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty of criminal sexual assault beyond a reasonable doubt where the evidence supported a finding that he committed an act of sexual penetration using force or threat of force. Trial court affirmed.

¶ 2    After a bench trial, the trial court found defendant, Robert Eugene Guerrero, guilty of criminal sexual assault and three counts of domestic battery. The trial court sentenced defendant to eight years' imprisonment for the criminal sexual assault conviction and entered convictions on the domestic batteries. On appeal, defendant argues that the State failed to prove him guilty beyond a reasonable doubt of criminal sexual assault. We affirm.

¶ 3                                I. BACKGROUND

¶ 4   In May 2019 the Winnebago grand jury indicted defendant with criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2018)), criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2018)) and three count of domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2018)), alleging that on March 11, 2019, defendant penetrated, by force, the mouth and vagina of the victim, T.P. with his penis, and defendant grabbed, dragged, and pushed T.P.

¶ 5   At trial, T.P., testified as follows. In March 2019, she was dating defendant. T.P. had known defendant since she was a child. She was best friends with defendant's sister and started hanging out with defendant who was older. T.P. and defendant began dating in May 2018 and then began living together. At first they lived with defendant's mother, defendant's friends, and defendant's sister. In February 2019, T.P. and defendant rented an apartment in Roscoe. Both their names were on the lease. They lived in a first-floor, two-bedroom apartment and slept in the same bedroom. The two bedrooms were down a hall from the open-floor design living room and kitchen. T.P. and defendant were both employed. T.P. worked for Walmart, and defendant worked for American Aluminum Extrusions.

¶ 6   T.P. testified that defendant's birthday was March 11. In 2019 defendant's birthday was on a weekday, so their families celebrated with him at the Roscoe apartment on March 10, a Sunday. T.P. had no specific plans for defendant the following day; his birthday. The morning of March 11, T.P. had a chiropractor appointment and needed to go to the bank. While she was at the bank, defendant called T.P. and asked her to return home for his birthday. He did not tell T.P. why he wanted her to come home, but he expressed anger that she went to the chiropractor. T.P. told defendant her anticipated arrival time. As T.P. drove home, defendant persisted to ask where T.P. was, via phone and text message. Defendant's aggressive communication style bothered T.P. She

continued to text defendant her location as she drove home. T.P. saved defendant's contact name in her phone as "Doodles."

¶ 7     T.P. also testified that when she returned to the apartment, she cooked tacos and rice for dinner. The defendant entered the kitchen and removed all her clothing, and she felt vulnerable. The defendant said that T.P. was naked because they could now cook naked if they wanted to in their own apartment together. The defendant did not remove his clothing. He sat on the couch in the living room and played video games as T.P. cooked dinner. After dinner defendant again played video games and asked T.P. to "suck his dick." T.P. told defendant that she did not want to and asked defendant if she could eat her food first. Defendant kept asking T.P. to "suck his dick." Defendant yelled at her that it "wasn't so hard" and to "do what I ask you to do and it's my birthday." As defendant sat on the couch, T.P. got on her hands and knees on the floor. She engaged in oral sex with defendant for less than 30 seconds. Defendant repeated that it was his birthday; T.P. stopped performing oral sex and told defendant that she could not and did not want to do it. Defendant became angry when T.P. stopped performing oral sex on him. Defendant then returned to playing a video game and left T.P. alone. Later that night defendant asked T.P. why "couldn't you just suck my dick."

¶ 8     T.P. testified that while she was still naked, she started to clean up the food. During the first few hours she and defendant were home, they argued. Defendant told T.P. "I asked you to do something special on my birthday." During their argument in the living room, defendant pushed T.P. on the couch and screamed at her until he calmed down. He hurt T.P. T.P. wanted to run away, but she was naked and could not leave the apartment. At some point defendant went into their bedroom to try to sleep before he worked a third shift.

¶ 9    T.P. testified that when defendant went into their bedroom, she got dressed and told him she was going to do the laundry. T.P. grabbed change for the laundry machines and heard defendant get out of bed. T.P. started recording video on her phone for proof that defendant was hurting her. She put her phone in the side pocket of her leggings to hide the phone from defendant. Defendant would not let T.P. exit the apartment. He grabbed the change and threw it across the room. Defendant grabbed T.P.'s arms and hair and dragged her down the hall into their bedroom. T.P. screamed for help because defendant was hurting her.

¶ 10    T.P. also testified that defendant put her on their bed. T.P. felt helpless and trapped. The more she screamed and tried to fight defendant off the more he pushed her down by the throat, grabbed her throat, and covered her mouth. At some point T.P. lost the ability to breathe. Defendant grabbed T.P.'s arms hard and said, "this is what I have to do to you if you won't – he said, basically, like he'll have to take it out on me this way, if, if, I won't have sex with him." Defendant told T.P. to "just take it." Defendant claimed that he was a sex addict and that he became aggressive if he did not have sex. He was violent and aggressive with her while she was on the bed. T.P. was terrified and tried to get away from defendant.

¶ 11    T.P. testified that when she stopped struggling, defendant settled down, and they laid next to each other on the bed. T.P. tried to be still and quiet so defendant would fall asleep. But he did not fall asleep. After a few minutes T.P. got up and told defendant she was going to do the laundry. She went into the bathroom and showed the camera how red her face appeared. Then T.P. picked up the change in the living room. Defendant yelled out and T.P. returned to the bedroom and laid back down. The two laid in silence and discussed different things. At the end of the video defendant told T.P. to leave.

¶ 12    T.P. testified that she went into the second bedroom, shut the door, and stopped the video recording. Defendant entered the room. She did not recall how he entered the room. She saved the recording in a hidden part of her phone so defendant could not find it. The video taken in the second bedroom shows defendant and T.P. dressed and does did not depict a sexual assault. Although T.P. did not invite defendant into the second bedroom, he followed her and entered the room.

¶ 13    T.P. was lying on the queen-sized bed when defendant entered the room. She did not recall how her clothes were removed. However, defendant entered the room, and T.P. did not feel free to leave the room. Defendant proceeded to have vaginal intercourse with T.P. T.P. testified:

> "I knew if I didn't do what he wanted that he was just going to hurt me again and I was scared that if I didn't - - because it had been going on for so long, that if I didn't do what he wanted, it was going to get worse and that he was going to do something that could potentially - - like I was, I was scared that he could have killed me almost because when he choked me and I couldn't breathe, I was scared if I didn't do what he wanted that he would just keep going until I couldn't breathe anymore."

During the incident, defendant was on top of T.P. on the bed, and he was stronger than her. Defendant put his penis in T.P.'s vagina, ejaculated, and returned to their bedroom. Defendant did not act lovingly after the act. The incident was not like the normal sex they had in their relationship.

¶ 14    T.P. testified that she immediately took a bath because she felt disgusting and violated. While in the bathroom she turned on music, and defendant entered the bathroom and asked why she was listening to such depressing music. Having received a text message from defendant's brother, T.P. relayed the message to defendant. Defendant wanted to know why T.P. was texting his brother. He grabbed the phone from T.P. and tried to break it in half but was unsuccessful, so

he threw it across the room and left the bathroom. T.P. called her father, Michael. Defendant returned to the bathroom and wrestled with T.P. for control of her phone. T.P. gained control of her phone and ran into the bathroom closet to call her father again. When her father answered T.P. screamed for him to help and to come over. T.P. told her father that defendant was hurting her, but she did not mention the sexual assault. Defendant then dropped to his knees and began to apologize to T.P.

¶ 15    T.P. stated that between 9:30 and 10p.m. her father, Michael, her cousin, Joey, her mother Debbie, and defendant's brother, Vito, arrived at the apartment. T.P. told them how defendant had hurt her, and that defendant told her to "suck his dick," but she was afraid to tell them, especially her father, about "having sex and stuff." When T.P. started talking about sex, her father told her that he did not want to hear about that.

¶ 16    T.P. testified that while Vito drove defendant to work, T.P.'s family stayed at the apartment with T.P. Her family asked her if she wanted to go to the police. But she did not go to the police because she was still shaken up, and she "was more afraid of what [defendant] would do to [her] if [she] involved the police." When Vito returned from driving defendant to work, he asked T.P. what happened. T.P. felt comfortable with Vito because she grew up with him. During their conversation defendant texted T.P. that he did not bring a lunch to work. T.P. was still afraid of defendant and told Vito she needed to bring him lunch. Vito drove T.P. to McDonalds and then to defendant's workplace, where defendant took the McDonalds bag. During the ride to defendant's workplace, defendant sent numerous text messages to T.P. Defendant "got mad that his brother [Vito] was there. As defendant walked away from the car, T.P. looked down at her phone. Defendant then returned to the car, grabbed T.P.s phone from her hands, yelled at her, and threw the phone back to her.

¶ 17    Michael testified that when he arrived at T.P.'s and defendant's apartment on the night of the incident, defendant appeared agitated and frustrated. He saw no marks or injuries on T.P.

¶ 18    Roscoe police detective Sam Hawley testified as follows. In the spring of 2019 Hawley was assigned as lead detective on the case. Hawley interviewed defendant on May 2, 2019. Defendant was not in custody at the time of the interview. Hawley informed defendant of his *Miranda* rights. Defendant signed a written copy of these rights. During the interview defendant stated that he was trying to get T.P. to leave and pack her things, and that he pulled her into the bedroom by her left arm. When Hawley confronted defendant with the cellphone video recording, he changed his statement and showed Hawley where he grabbed T.P.'s head. Defendant told Hawley that he believed the night of the incident, T.P. had sex with his brother. Defendant stated that he dragged T.P. into the master bedroom, took her clothes off hangers, and told her to leave. Defendant said that he and T.P. had consensual sex in the master bedroom, but when Hawley confronted him by stating that the sexual assault occurred in the spare bedroom, defendant nodded. Near the end of the interview, Hawley asked defendant about his knowledge that T.P. did not want sex that night, and defendant told Hawley, but she gave it to me anyway.

¶ 19    Hawley also testified that he interviewed T.P., obtained photos from her that showed marks on her neck, and obtained the video and audio recorded on her cellphone.

¶ 20    The State rested and defendant moved for a directed finding, which the trial court denied.

¶ 21    Defendant testified as follows. On March 11, 2019, defendant's birthday, he planned to spend the day with T.P. before working the 11 p.m. third shift. While T.P. was not at home during the day, defendant sent her several text messages telling her to get home. He was insistent that T.P. return home because he thought she was cheating on him. The text messages included, "U really let me go on my birthday wit [*sic*] out sex" and "u could at least suck my dick." Defendant

demanded T.P. to send her location and that she "Get tf [*sic*] home OR don't come home." T.P. arrived home between 4 and 5 p.m.

¶ 22    Defendant denied that he told T.P. to cook naked, denied that he removed her clothes, and denied that she cooked while naked. Defendant played video games and ate his dinner in the living room while T.P. was in the kitchen. After dinner defendant requested oral sex. T.P. asked him to wait until she had eaten, and he allowed her to eat. Defendant took a nap in their bedroom. After waiting for T.P. for 45 minutes to an hour, defendant asked her again for oral sex. T.P. asked defendant to wait until she was done cleaning up. Defendant testified that he "got mad." At some point T.P. began to perform oral sex on defendant and he told her to stop "because it just felt wrong that she was literally only do[ing] that so I can['t] kick her out."

¶ 23    Defendant testified that at the beginning of T.P.'s cellphone recording, he was upset because T.P. was not "getting the clue" that he wanted to kick her out. When defendant said "take it or take this love," he was hugging her and telling her to take his love. When defendant said, "show me how much you love me," he wanted T.P. to say something to save their relationship.

¶ 24    Defendant testified that he grabbed T.P. by the arm and, as she fell out, he accidentally grabbed her by her hair and arm to take her to get her clothes out of the closet. Then she looked into the mirror and said, "help me." Defendant testified that "I was trying to save our relationship, we were talking, and everything calmed down." T.P. walked out of their bedroom, went to the spare bedroom, and returned to their bedroom. T.P. asked defendant if he wanted to have sex to make him happy. Defendant replied yes and T.P. started to remove her clothes. Defendant suggested that they have sex in the spare bedroom, and they removed her clothes there. A few minutes after the cellphone video recording ended, defendant had sexual intercourse with T.P. They had consensual vaginal sex. T.P. took a bath and while she was in the bathroom, defendant

heard T.P. on the phone with her father saying that defendant had beat her up "and all this crazy stuff." Shortly thereafter, T.P.'s father and cousin arrived.

¶ 25    The trial court found defendant not guilty of criminal sexual assault as alleged in count II, penetration, penis to mouth. However, the court found defendant guilty of criminal sexual assault as alleged in count I, penetration penis to vagina. Regarding count I, the court found T.P. more credible than defendant, in part, because T.P.'s testimony was corroborated, and defendant's testimony was contradicted by his statements to detective Hawley. The court also found defendant guilty of all three counts of domestic battery: count III – grabbed T.P. causing bruising, count IV - dragged T.P. by the hair, and count V – pushed T.P. Defendant filed a posttrial motion challenging the sufficiency of the evidence, which the trial court denied.

¶ 26    On June 19, 2020, the trial court sentenced defendant to eight years' imprisonment for the criminal sexual assault conviction and entered convictions on the domestic batteries. Defendant filed his timely notice of appeal on July 15, 2020.

¶ 27                                    II. ANALYSIS

¶ 28    Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of criminal sexual assault because the State failed to prove force or threat of force to engage in vaginal sex, and the State failed to disprove that the victim consented to vaginal sex after the victim performed oral sex on defendant.

¶ 29    When reviewing the sufficiency of the evidence, the relevant question is whether, after viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Davison*, 233 Ill. 2d 30, 43 (2009). All reasonable inferences from the evidence must be drawn in favor of the prosecution. *People v. Hardman*, 2017 IL 121453, ¶ 37. The trier of fact determines the credibility

of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence. *People v. Swenson*, 2020 IL 124688, ¶ 36. The testimony of just one credible witness is sufficient for conviction. *Id*. This court will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 30    After applying these principles here and examining the reasonableness of the evidence in the light most favorable to the State, we determine that any rational trier of fact could have found defendant guilty beyond a reasonable doubt of criminal sexual assault.

¶ 31    To prove defendant guilty of criminal sexual assault, the State was required to prove that defendant committed an act of sexual penetration against T.P. by the use of force. See 720 ILCS 5/11-1.20(a)(1) (West 2018).

¶ 32    "The element of force refers to actions of the defendant that physically compel the victim to submit to the act of sexual penetration." *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74. Force is the essence of the crime of rape. *Id*. Force or threat of force is defined as:

> "[T]he use of force or violence or the threat of force or violence, including, but not limited to, the following situations:
>
> > 1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat;
> >
> > 2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2018).

Force does not include the force inherent to the act of physical penetration. *People v. Alexander*, 2014 IL App (1st) 112207 ¶ 52. Rather, there must be some kind of physical compulsion, or threat thereof, that causes the victim to submit to the penetration against their will. *People v. Denbo*, 372 Ill. App. 3d 994, 1005 (2007). Where the circumstances show resistance is futile or life endangering, or if the victim is overcome by superior strength or fear, useless acts of resistance are not required. *People v. Parker*, 2016 IL App (1st) 141597, ¶ 35.

¶ 33    Where, as here, a defendant raised the affirmative defense of consent, the State had the burden of proof beyond reasonable doubt on the issues of lack of consent. See *People v. Haywood*, 118 Ill. 2d 263, 274 (1987). Section 11-1.70(a) of the Code provides, in part:

> "'Consent' means a freely given agreement to the act of sexual penetration or sexual conduct in question. Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the accused shall not constitute consent. The manner of dress of the victim at the time of the offense shall not constitute consent."
>
> *Id*.

Further, subsection section 11-1.70(c) of the Code provides:

> "A person who initially consents to sexual penetration or sexual conduct is not deemed to have consented to any sexual penetration or sexual conduct that occurs after he or she withdraws consent during the course of that sexual penetration or sexual conduct."
>
> *Id*. § 11-1.70(c).

¶ 34    Defendant does not dispute that he vaginally penetrated T.P. Rather, he contends that the evidence was insufficient to prove that the vaginal penetration took place by force or without consent. We disagree.

¶ 35    Here, after viewing the evidence in the light most favorable to the State, we determine that a rational trier of fact could conclude that defendant used the threat of force to commit an act of sexual penetration and that the act was nonconsensual. Both defendant and T.P. testified that the vaginal penetration occurred minutes after she stopped the video recording on her cellphone. Defendant and T.P. testified that minutes before the video recording ended, defendant committed three domestic batteries against T.P. Defendant grabbed T.P.'s arm, dragged her by the hair down the hall, and pushed her. Defendant makes no challenge to these convictions or this evidence. T.P. testified that she screamed for help as defendant dragged her by the hair to the bedroom. She also testified that defendant put her on the bed, and as she screamed and resisted him, the harder he pushed her down by the throat. Defendant grabbed T.P.'s throat and covered her mouth to the point where she could not breathe. The video and audio recording corroborates T.P.'s testimony. At the start of the video T.P. is crying, states, "you're hurting me," and makes sounds as if she is in pain. Later defendant says, "I'm trying to save our relationship. If you would have just sucked my dick like I asked you to; instead, you make me hurt you."

¶ 36    T.P. testified that minutes later, defendant followed T.P. into the spare bedroom and demanded sex from her. While on top of her, he put his penis in her vagina. T.P. testified that she was scared defendant would kill her because he had recently choked her to the point where she could not breathe. She did not want things to get worse. From this testimony, the trial court could have reasonably inferred that T.P. believed that physical resistance to defendant would have been futile. See *Parker*, 2016 IL App (1st) 141597, ¶ 35. See also *People v. Brials*, 315 Ill. App. 3d 162, 173 (2000) (stating that physical resistance or protestations are not necessary to demonstrate that a victim was forced to have sexual intercourse, and the absence thereof does not establish consent "if the victim was threatened or in fear of being harmed.").

¶ 37 Defendant's arguments amount to a request that we substitute the trial court's judgment regarding T.P's credibility, and the weight given to her testimony, with our own. This we will not do. See *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). Such determinations are the trier of fact's responsibility. *Id*. We will not reverse a conviction unless the evidence is unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). This is not one of those cases. Viewing the evidence in the light most favorable to the State, we conclude that any rational trier of fact could have found defendant guilty beyond a reasonable doubt of criminal sexual assault.

¶ 38 Defendant attempts to create reasonable doubt by noting inconsistencies or contradictions in T.P.'s testimony. However, we are not persuaded. Defendant was convicted of committing three domestic batteries against T.P. just prior to sexually assaulting her. Defendant does not challenge his domestic battery convictions. We believe those batteries establish that resistance would have been futile and may have placed T.P. in further danger. Cherry picking is one thing; disregarding the aggressive criminal behavior of defendant by attempting to suggest a failure of proof is patently meritless.

¶ 39 Defendant cites *Mpulamasaka*, 2016 IL App (2d) 130703, to support his argument. In *Mpulamasaka*, we reversed the defendant's conviction of aggravated criminal sexual assault where there was no evidence that the victim feared the defendant, or that the defendant struck or threatened the victim. *Id*. ¶ 76. Further, penetration occurred when the victim straddled the defendant, and when the victim complained of pain, the defendant withdrew. *Id*. ¶ 99. Here, the evidence showed that just prior to the criminal sexual assault, defendant battered the victim. He dragged the victim by her hair down a hall, grabbed her arm, and pushed her. The victim submitted

because she reasonably feared defendant. Therefore, *Mpulamasaka*, is distinguishable from this case.

¶ 40                                III. CONCLUSION

¶ 41    The judgment of the circuit court of Winnebago County is affirmed.

¶ 42    Affirmed.